**Craig CUTSFORTH, etc., Plaintiff(s),**

v.

**Arnold C. RENSCHLER, et al., Defendant(s).**

No. 8:98–CV–2424–T–30TGW.

United States District Court, M.D. Florida, Tampa Division.

Sept. 18, 2002.

Mark C. Gardy, Karin E. Fisch, Abbey & Gardy, LLP, New York City, Michael E. Criden, Hanzman & Criden, P.A., Coral Gables, FL, Leo W. Desmond, Law Office of Leo W. Desmond, West Palm Beach, FL, Stanley M. Grossman, Pomerantz, Haudek, Block, Grossman & Gross, LLP, Julian H. Kreeger, Robert R. Adler, Milberg, Weiss, Bershad, Hynes & Lerach, Boca Raton, FL, Mark J. Heise, Heise Markarian, P.A., Miami, FL, Patrick V. Dahlstrom, Pomerantz, Haudek, Block, Grossman & Gross, LLP, Chicago, IL, Stephen J. Fearon, Jr., New York City, for Plaintiffs.

Thomas George Long, Barnett, Bolt, Kirkland & Long, Tampa, FL, Todd R. David, Craig H. Kuglar, Jason N. Poulos, Alston & Bird, LLP, Atlanta, GA, for Defendants.

Mark C. Gardy, Stephen J. Fearon, Jr., Abbey & Gardy, LLP, New York City, Leo W. Desmond, Law Office of Leo W. Desmond, West Palm Beach, FL, Steven G. Schulman, Samuel G. Schulman, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, Melvyn I. Weiss, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, San Diego, CA, Julian H. Kreeger, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, Boca Raton, FL, David L. Mandelbaum, Law Offices of David L. Mandelbaum, New York City, Jack E. Reise, Cauley, Geller, Bowman & Coates, LLP, Boca Raton, FL, for Movants.

### ORDER

MOODY, District Judge.

**THIS CAUSE** came on for consideration upon the Report and Recommendation submitted by Magistrate Judge Thomas G. Wilson (Dkt.# 118), Plaintiffs' Objection to Report and Recommendation (Dkt.# 120), and Defendants' response (Dkt.# 122).

The Court notes that Plaintiffs have objected to, among other things, the Magistrate's use of a map to determine the distance between two particular cities in discounting one of Plaintiffs' contentions.[1] Plaintiffs contend that this "consideration of matters outside the pleadings effectively converted the Defendants' motion to dismiss into a motion for summary judgment." (Page 3 of Plaintiffs' Objection to Report and Recommendation). Defendants counter that it was appropriate for the Magistrate to take judicial notice of commonly available information of geography. It is unnecessary for this Court to resolve this dispute since the geographical information was not critical to the analysis contained in the Report and Recommendation. The Magistrate had already dispensed with Plaintiffs' contention by determining from the Complaint and available documents, particularly document # 83, that the existence of two pharmacies in towns in Colorado with overlapping delivery routes would be inconsequential to the investing public regarding PharMerica, an entity with approximately 160 pharmacy facilities located across thirty-seven states. (Page 82, Report and Recommendation).

This Court, without relying on the map mileage between the two towns in Colorado, is of the opinion that the Magistrate Judge's Report and Recommendation should be adopted, confirmed, and approved. The Court notes that Plaintiffs have not sought the opportunity to further amend the existing Second Amended Complaint.

**ACCORDINGLY**, it is therefore, **ORDERED AND ADJUDGED**:

1. The Magistrate referred to a Colorado state map at Yahoo.Com to determine the distance between two cities in the state of Colorado referenced on page 83 of the Report and Recommendation.

1) The Report and Recommendation of the Magistrate Judge is adopted, confirmed, and approved in all respects (except for the reference to the mileage on page 83 thereof), and said Report and Recommendation is made a part of this order for all purposes, including appellate review.

2) The Defendants' Motion to Dismiss (Dkt.# 83) is GRANTED. The Second Amended Complaint is DISMISSED with prejudice.

## REPORT AND RECOMMENDATION

WILSON, United States Magistrate Judge.

This suit is brought as a securities class action on behalf of purchasers of the common stock of defendant PharMerica from January 7, 1998, through July 24, 1998. The suit seeks to impose liability under the Securities Exchange Act of 1934 against PharMerica and certain of its officers based on their alleged dissemination of materially false and misleading statements about PharMerica's business and financial condition and the purported success of its aggressive acquisition program. Such a suit must meet the heightened pleading requirements of the Private Securities Litigation Reform Act. The plaintiffs' second amended complaint fails to meet those requirements. Accordingly, I recommend that the defendants' motion to dismiss that complaint (Doc. 83) be granted. Moreover, I recommend that the dismissal be with prejudice since the plaintiffs have had a fair and sufficient opportunity to submit a viable complaint.

### I.

The plaintiffs are a putative class of persons who purchased common stock in PharMerica, Inc., between January 7, 1998, and July 24, 1998. PharMerica is a corporation that was registered with the Securities and Exchange Commission (SEC) and whose common stock was actively traded on the NASDAQ market during the class period. It provided pharmacy products and services to the elderly, chronically ill, and disabled in long-term care and alternate site settings, such as skilled nursing and assisted living facilities. It also supplied mail-order pharmacy services to workers' compensation and catastrophic care markets.

The individual named defendants were purportedly officers of PharMerica during the class period. Thus, it is alleged (apparently inaccurately) that defendant Arnold Renschler was its president and chief executive officer and a member of its board of directors; defendant Robert Della Valle was the company's executive vice president and chief executive officer; and defendant James Shelton was the company's executive vice president and chief financial officer (Doc. 81, pp. 9–10).

PharMerica was formed in December 1997, through a merger of the Pharmacy Corporation of America (PCA) and Capstone Pharmacy Services (Capstone), two corporations that provided institutional pharmacy products and services. It was perceived that changes in the institutional pharmacy industry favored the consolidation of pharmacies because, among other things, larger size equated to larger discounts from suppliers and a national market presence was purportedly beneficial in competing for contracts. Accordingly, in light of these benefits that prompted the merger of Capstone and PCA, PharMerica declared that after the merger it would employ a "growth through acquisition" strategy in order to increase its sales and improve its profitability.

In furtherance of its growth strategy, PharMerica pursued the acquisition of many pharmaceutical companies during the first and second quarters of 1998. The second amended complaint (which for con-

venience will usually be referred to simply as "the complaint") focuses on the press releases announcing a number of acquisitions.[1] Thus, the complaint alleges that in a press release dated January 7, 1998, PharMerica stated (*id.* at pp. 14–15):

> [It] ... ha[d] expanded its pharmacy network on both coasts with the acquisitions of Sweetwater Pharmacy in Spring Valley, Calif., and Hollins Manor Pharmacy in Roanoke, VA.
>
> Together, the acquisitions are expected to generate $11.2 million as a result of services provided to nearly 4,300 beds.[2]

The following day, January 8, 1998, PharMerica announced its acquisition of the Medical Arts Pharmacy of Pittsburgh. It stated that "[t]he acquisition marks Pharmerica's [*sic*] entry into the Pittsburgh metropolitan area and is expected to generate $8.4 million as a result of services provided to nearly 1,350 beds" (*id.* at p. 16).

On January 15, 1998, PharMerica issued a press release publicizing its acquisition of Resident Care Pharmacy in North Carolina, saying that "[t]he acquisition is expected to generate $14.5 million as a result of services provided to approximately 3,800 beds" (*id.* at p. 17).

On January 20, 1998, PharMerica announced its acquisition of Express Pharmacy Services (EPS) and Tmesys, Inc., providers of mail-order pharmacy services for the workers' compensation industry. The press release allegedly said that "[w]ith an average annual growth rate of 21% since 1993, EPS and Tmesys are expected to generate more than $30 million in revenue this year" (*id.* at p. 18).

On February 9, 1998, PharMerica issued a press release announcing record revenues of $195.3 million and pro forma net income of $7.2 million, or $.12 per share, for the fourth quarter ending December 31, 1997. In this regard, Renschler allegedly commented (*id.* at pp. 25–26):

> The record levels of revenues and earnings before non-recurring charges reported for the fourth quarter and twelve months of fiscal 1997 reflect the continuing strong operating trends of our Company and the successful consummation of the merger announced last year. I am pleased to report that we have achieved the milestones in connection with the merger which we anticipated would be completed by year end.

.    .    .    .    .

1. Part I contains a statement of facts that is based upon the allegations in the second amended complaint. In fact, the second amended complaint does not always accurately reflect what is stated in the press releases. In particular, the quotations are set out as they are alleged in the complaint and not as they are stated in the press releases. Further, the press releases do not contain the emphasis that is shown in the complaint, and, accordingly, that emphasis is, for the most part, disregarded in this document.

2. All but one of the press releases at issue have been provided to the court. Those submitted typically contain the following cautionary language (*see* Doc. 83, Ex. E):

> This release involves forward-looking statements with respect to acquisition prospects, development of preferred provider relationships, and other plans and expectations on the part of the company. The accuracy of these statements involves a number of risks and uncertainties, including but not limited to the availability of acquisition prospects and financing for such prospects, changing economic and market conditions that would impact such prospects or financing related thereto, changes in governmental reimbursement regulations and laws that could impair or hinder the entering into of strategic alliances of preferred provider agreements, as well as other risk factors detailed in the company's Securities and Exchange Commission findings [*sic*], to which recipients of this release are referred for additional information concerning the company and its prospects.

During the fourth quarter we acquired pharmacy operations which will add approximately $34 million in annualized revenues and expand our service coverage in several key states. With our new credit facility in place we will have additional capital resources to continue our strategic acquisition program.

.    .    .    .    .

Our commitment is to provide superior pharmacy services to our patients while creating value for our shareholders.

On February 18, 1998, PharMerica announced the acquisition of Kentucky Health Services, Inc., making PharMerica the largest institutional pharmacy services provider in Kentucky. The press release said that this acquisition was expected to generate $20.6 million in 1998 (*id.* at p. 28).

On February 27, 1998, PharMerica announced, as "part of [its] strategic plan to improve efficiencies of scale and expand geographic reach," its acquisition of a Michigan pharmaceutical company (*id.* at p. 29):

> Pharmerica [*sic*] ... is entering the Michigan market with the acquisition of the long-term care business formerly owned by Frank's Pharmacy and Medical Supply in Detroit. The acquisition is expected to generate annual revenues of approximately $5.8 million.

In March 1998, PharMerica publicized more acquisitions of pharmaceutical companies. Thus, on March 3, 1998, PharMerica issued a press release relating that it had acquired the Whitney Village Pharmacy in California. It stated that "[t]his acquisition, along with our other recent string of pharmacy transactions, continues PharMerica's dynamic growth and adds enhanced value for our customers and investors" (*id.* at p. 30).

The complaint alleged (incorrectly) that on "March 6," [*sic*] 1998, PharMerica announced its acquisition of Senior Dimensions Pharmacy in Minneapolis, Minnesota,

and Western North Carolina Pharmacy in Waynesville, North Carolina (*id.* at p. 32). PharMerica stated that these pharmacies were expected to generate annual revenues of nearly $7 million and that "[t]hese acquisitions support our strategy of becoming a key player in nationwide markets" (*id.*). PharMerica further said that, "[b]y including these companies in our family of pharmacy services, Pharmerica [*sic*] adds value for our customers and investors" (*id.*).

Allegedly as a result of these positive press releases and financial statements, PharMerica's stock price reached its 52–week high of $16 per share on March 13, 1998 (*id.* at p. 33).

Financial results for the year 1997 were stated in PharMerica's annual report filed with the SEC on March 31, 1998. That report said that PharMerica used "more centralized financial and inventory controls systems support than is typically available to small, independent pharmacy operators" and that many services, including oversight and financial and accounting functions, were performed at the corporate level (*id.* at p. 34). In that report, it elaborated (*id.*):

> [PharMerica] believes that, when fully realized, the synergies from the merger [between PCA and Capstone] would be approximately $25 million annually. This includes savings from the consolidation of 19 institutional pharmacies, seven of which have already occurred, more favorable pricing terms in the Company's new primary purchasing contracts and corporate and regional overhead reductions.
>
> .    .    .    .    .
>
> The Company expects to realize approximately $16 million of these synergies in 1998 and the full $25 million...beginning in 1999.

On April 1, 1998, PharMerica announced that $325 million in notes had been placed. Defendants used this opportunity to continue to extol the supposed success of its acquisition strategy, and the "milestones" the company was achieving. With regard to the credit facility Renschler stated (*id.* at pp. 35–36):

We are pleased with the reception to our subordinated debt offering and, as a result, we have increased our offering from $300 million to $325 million. The interest rate on this offering reflects PharMerica's position as a leading provider of institutional pharmacy services.

On April 15, 1998, PharMerica announced its acquisition of the Chamberlain Group, LLC, of Virginia.

PharMerica issued a press release on May 4, 1998, reporting record revenues for the first quarter ending March 31, 1998 (*id.* at pp. 36–37). It announced revenues of $274 million and a net income of $.13 per share, which was a 59% increase over the previous year's results (*id.* at p. 37). In this connection, Renschler commented (*id.*):

PharMerica's strong, top-line growth, combined with improvements in operating margins, has resulted in solid first quarter financial performance and progress in achieving our strategic objectives. Thanks to our extensive merger integration planning, we have achieved all of the first quarter milestones established last year.

. . . . .

With PharMerica's first quarter successes, we are well-positioned to move forward with efforts to establish PharMerica as the nation's premier provider of geriatric pharmacy services.

On May 15, 1998, these financial results were repeated to the SEC in PharMerica's Form 10–Q, which also iterated (*id.* at p. 41):

The Company believes that, when fully realized, the synergies from the merger would be approximately $25 million annually.

. . . . .

The Company expects to realize approximately $16 million of these synergies in 1998 and the full $25 million...beginning in 1999.

PharMerica further noted in the Form 10–Q, however, that it had a negative operating cash flow for the first quarter of 1998 totaling $13.6 million.

Defendant Renschler sent a letter dated May 15, 1998, to the shareholders, which was filed with the SEC on May 18, 1998. The letter allegedly said (*id.* at pp. 39–40):

Our first annual report outlines our success in combining the resources of two outstanding institutional pharmacy groups, Capstone Pharmacy Services, Inc. and Pharmacy Corporation of America (PCA).

This effective integration is a key to PharMerica's leadership position in the new competitive marketplace.

Because of the progress we have made since our merger, we thought we would give you an update on these accomplishments and where we are headed.

The recent first quarter also saw a great emphasis placed on taking advantage of the benefits of integration.

Finally, we are happy to report that at our first senior management meeting in April, the energy and camaraderie exhibited by PharMerica managers proved that Capstone and PCA have merged easily and quickly.

In June and July 1998, PharMerica announced the acquisition of three more companies. Thus, on June 8, 1998, the company issued a press release allegedly stating that it had reached an agreement in principle to acquire NIPSI in New Mexico,

which operated 35 pharmacies in 15 states and served 38,000 beds (*id.* at p. 47). This press statement was followed on July 9, 1998, with the following announcement (*id.* at p. 48):

> PharMerica ... is expanding its pharmacy network with the acquisition of Apothecare Pharmacy Inc. in Tampa, Fla. and Greenville Pharmacy in Portland, Conn.... The acquisitions are expected to generate $2 million of annual revenues each.

On July 23, 1998, PharMerica issued a press release announcing its earnings for the second quarter of 1998. The earnings per share were at least $.02 less than the $.14 per share the market had expected (*id.* at p. 50). Following this announcement, PharMerica common stock fell approximately 40%, to close at $5.50 per share (*id.* at p. 51).

On August 4, 1998, the company officially announced earnings of $.12 per share. Renschler allegedly stated that the following factors had contributed to the company's reported results (*id.* at p. 52):

> (1) To realize improved efficiencies of scale, PharMerica has shifted its emphasis to larger acquisitions, which inherently require more time to close and the planned transaction with IHS [NIPSI] did not close during the second quarter as anticipated; (2) the divestiture of non-strategic businesses has begun with the sale of PharMerica'[s] department of corrections (DOC) business, but other non-strategic businesses have not been divested as anticipated; (3) there have been operating shortfalls at a limited number of pharmacy locations, which are currently being addressed; and (4) there were delays in the consolidation of some same-site pharmacies.

In connection with the earnings announcement, Renschler advised that Shelton was being replaced as chief financial officer and would assume new duties as senior vice president of corporate development.

On November 9, 1998, PharMerica announced a net loss of $127.4 million for the third quarter of 1998 (*id.* at p. 52). PharMerica stated that the results were affected by pre-tax charges related to write-downs of certain assets. Specifically, there was an impairment loss of approximately $99 million relating primarily to five pharmacies and a loss of $4.5 million from the sale of its department of corrections business (*id.* at pp. 52–53). There was also a pre-tax charge of $37 million to increase the company's allowance for doubtful accounts due to a change to a "more conservative accounting method" (*id.* at p. 53).

On November 27, 1998, the plaintiffs filed this class-action lawsuit. Their complaint was subsequently amended twice: first, as a matter of course in connection with the consolidation of a related lawsuit, and second, in response to a determination that the first amended complaint failed to satisfy the pleading requirements of the Private Securities Litigation Reform Act (Docs. 80, 82).

In the second amended complaint, the plaintiffs allege generally that, during the class period from January 7, 1998, through July 24, 1998, the defendants disseminated false and misleading statements in their press releases, financial statements and reports that minimized the risks associated with the company's aggressive acquisition strategy and the complexities in consolidating Capstone and PCA (Doc. 81, p. 5). They also contend that PharMerica falsely portrayed the costs associated with the consolidation program and the performance of several of the acquired entities (*id.*). The plaintiffs further allege that the defendants issued materially inflated financial results as part of their overall scheme to conceal and misrepresent the true state

of the company's business and operating condition in order to maintain the market price of its common stock at artificially inflated levels (*id.* at pp. 5–6). As a result, the plaintiffs assert that they suffered damages in connection with the purchase of PharMerica stock during the period from January 7, 1998, through July 24, 1998 (*id.* at pp. 7, 67).

More specifically, the plaintiffs contend that, virtually from its inception, PharMerica's growth strategy was a failure and that the defendants knew it (*id.* at pp. 3–5). Among other things, the plaintiffs allege that, from the outset, PharMerica knew that it (1) was experiencing serious operational problems integrating the computer systems of Capstone and PCA and its acquisitions; (2) had no reasonable basis for the projected revenues of its newly acquired pharmacies as stated in many press releases; (3) set unrealistic goals and budgets for many of its pharmacies; (4) arbitrarily increased monthly revenues; (5) had bogus or inflated accounts with nursing homes and retained as clients known credit risks; (6) failed to properly bill customers and pursue accounts receivable; and (7) was experiencing delays in divesting certain businesses and consummating announced acquisitions (*id.* at pp. 20–25).

Furthermore, the plaintiffs assert that PharMerica materially overstated its income in order to deceive the investing public into thinking that the merger and the growth by acquisition strategy were proceeding smoothly. Thus, the plaintiffs allege that the defendants engaged in accounting manipulations by improperly deferring impairment losses, purportedly in violation of generally accepted accounting principles (GAAP) (*id.* at p. 44). The plaintiffs allege in particular that the defendants improperly deferred from earlier accounting periods a $103.5 million impairment loss generated by five of its pharma-

cies and its department of corrections business (*id.*).

The defendants, in response to the second amended complaint, have filed a motion to dismiss the complaint for failure to state a claim for relief (Doc. 83). Specifically, they argue that the second amended complaint fails to satisfy the stringent pleading requirements of the Private Securities Litigation Reform Act. They contend further that the second amended complaint should be dismissed with prejudice because the plaintiffs have had ample opportunity to investigate their allegations of wrongdoing and draft a cognizable complaint.

The motion to dismiss was referred to me for a report and recommendation (Doc. 87). Thereafter, a hearing was conducted on the motion.

## II.

In the second amended complaint (Doc. 81), the plaintiffs allege that the defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the Act), 15 U.S.C. 78a *et seq.* In § 10, the Act makes it illegal for any person "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. 78j(b). In Rule 10b–5, the SEC made it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. 240.10b–5. In order to state sufficiently a

claim for securities fraud under Rule 10b–5, the plaintiff must allege (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) upon which the plaintiff relied, (5) that proximately caused the plaintiff's injury. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 (11th Cir.1999).

The sufficiency of claims of securities fraud, contrary to the plaintiffs' suggestion (Doc. 89, p. 8), is not determined pursuant to the standard of *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), under which a complaint passes muster unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which could entitle him to relief. Indeed, in all events, averments of fraud must be stated with particularity. Rule 9(b), F.R.Civ.P. The plaintiffs are correct that all well-pleaded facts are accepted as true, and all reasonable inferences drawn therefrom are construed in the light most favorable to their side. *Ehlert v. Singer*, 245 F.3d 1313, 1315 (11th Cir.2001).

In cases of alleged securities fraud, however, Congress in 1995 increased the pleading requirements through the enactment of the Private Securities Litigation Reform Act (Reform Act). 15 U.S.C. 78u–4 *et seq.* The Reform Act provides that, when a plaintiff alleges that a defendant made an untrue statement of a material fact or omitted a material fact necessary to make a statement not misleading, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. 78u–4(b)(1). Furthermore, "the complaint shall, with respect to each act or omission ..., state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. 78u–4(b)(2).

The Eleventh Circuit has held that, under the Reform Act, a showing of severe recklessness generally continues to be sufficient to establish the requisite state of mind. *Bryant v. Avado Brands, Inc., supra*, 187 F.3d at 1283. " 'Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.' " *Bryant v. Avado Brands, Inc., supra*, 187 F.3d at 1282 n. 18.

The Reform Act, however, set out particular circumstances where a showing of severe recklessness would not suffice. Thus, the Reform Act created a "safe harbor" that will shield defendants from liability for certain "forward-looking" statements. 15 U.S.C. 78u–5(c); *Bryant v. Avado Brands, Inc., supra*, 187 F.3d at 1278–79. A forward-looking statement is defined as a statement regarding, among other things, financial projections, management's plans and objectives for future operations, future economic performance, and assumptions relating to any of these types of statements. 15 U.S.C. 78u–5(i)(1).

The safe harbor enables defendants to avoid liability with respect to forward-looking statements if the statement is identified as a material forward-looking statement and is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. 78u–5(c)(1)(A); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir.1999). If the

statement is accompanied by the required meaningful cautionary language, "the defendants' state of mind is irrelevant." *Harris v. Ivax Corp., supra,* 182 F.3d at 803; *Theoharous v. Fong,* 256 F.3d 1219, 1225 n. 6 (11th Cir.2001).

Alternatively, if the material forward-looking statement is not accompanied by meaningful cautionary statements, the defendants will not be liable unless the plaintiffs prove that the forward-looking statement was made with actual knowledge that the statement was false or misleading. 15 U.S.C. 78u–5(c)(1)(B); *Harris v. Ivax Corp., supra,* 182 F.3d at 803. Thus, the plaintiffs in this type of circumstance must allege with particularity facts giving rise to a strong inference that the defendants made the forward-looking statements with actual knowledge that they were false or misleading. *Theoharous v. Fong, supra,* 256 F.3d at 1224–27.

### III.

A. The Reform Act expressly requires a complaint in this type of case, in order to avoid dismissal, to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. 78u–4(b)(1). This statutory requirement obviously contemplates that, upon a motion to dismiss, an analysis will be conducted on a statement-by-statement basis.

Unfortunately, the parties' memoranda do not contain an analysis of that kind, although the defendants' reply does at least evaluate an example of an alleged false statement in a press release (Doc. 91, pp. 5–7). The plaintiffs' approach in their memorandum is to make broad allegations of fraud and to convey the impression that something improper took place; the memorandum lacks any particularized focus upon the specific statements alleged in the complaint to be false or misleading. The defendants' method was to characterize the false or misleading statements as falling into two categories (the "Acquisition Theory" and the "Write–Off Theory") (Doc. 83, p. 9; Doc. 91, p. 4), despite the fact that the plaintiffs insist that "the two 'theories' are part of an integrated whole and cannot be considered apart from one another" (Doc. 89, p. 11) and despite the fact that these two categories do not cover all of the statements set out in the complaint as being false or misleading. In other words, the parties' memoranda lack the detailed analysis of each alleged false or misleading statement that is envisioned by the Reform Act.

The plaintiffs' seventy page complaint describes in a thirty-seven page section in the middle of the document alleged false and misleading statements that were made on fifteen occasions between January 7, 1998, and July 9, 1998 (Doc. 81, pp. 14–50). In that section, the plaintiffs attempted to comply with the Reform Act by setting forth the false and misleading statements and the reasons why the statements were false or misleading. Consequently, the general allegations of fraudulent conduct that the plaintiffs have strewn throughout the remainder of the complaint will not be considered in determining which statements are alleged to be false or misleading and why they are false or misleading.

Further, within the section containing the alleged false or misleading statements, the plaintiffs have quoted from various press releases and SEC filings. Some of the quoted language is contextual or, for other reasons, cannot reasonably be viewed as a potential false or misleading statement. Accordingly, any language that is not related to the reasons given for alleging that the statement is false or misleading will be disregarded.

However, within these parameters there remain numerous statements that require individual analysis. The place to start is with the allegation that the defendants

made false and misleading statements regarding pharmacies that PharMerica was acquiring. While, contrary to the defendants' approach, the alleged false and misleading statements do not relate exclusively to the acquisitions, they primarily concern that subject. The alleged false and misleading statements that relate to other matters will be considered after the statements regarding acquisitions have been fully addressed.

B. The main thrust of the plaintiffs' complaint is based upon statements concerning the defendants' expectations about revenues from pharmacies being acquired. These statements, in general, do not support a claim of fraud because the plaintiffs failed to allege any facts showing that the expectations did not come true. In other words, the statements were not false.

Further, the statements about expected revenues from acquisitions were forward-looking statements. Most of these statements are not actionable because they were accompanied by meaningful cautionary statements. In addition, the allegations regarding these forward-looking statements are insufficient since they fail to demonstrate that the statements were made with actual knowledge that they were false or misleading.

■ 1. The first alleged false or misleading statement was made on January 7, 1998, just shortly after the December 1997 merger that created PharMerica. This claim is based upon a press release that contained the following announcement (Doc. 81, ¶ 30):

Pharmerica [*sic*] (formerly Capstone and Pharmacy Corporation of America) has expanded its pharmacy network on both coasts with the acquisitions of Sweetwater Pharmacy in Spring Valley, Calif., and Hollins Manor Pharmacy in Roanoke, VA.

Together, the acquisitions are expected to generate $11.2 million as a result of services provided to nearly 4,300 beds. The reasons given in the complaint why these statements are false or misleading are, in their entirety (Doc. 81, ¶¶ 31, 32):

31. The Company's January 7, 1998 statements were false and misleading because, as Defendants knew, but omitted to disclose to the investing public, the merger between Capstone and PCA was problematic from the outset. As discussed in ¶ 40 below, PharMerica was having severe problems integrating the systems of PCA and Capstone and subsequently integrating those systems with the systems of other pharmacy operations it was acquiring. For example, as specially discussed at ¶ 40(a) below, immediately upon consummation of the Capstone/PCA merger the Company began experiencing extreme difficulty in merging the computer systems of Capstone and PCA.

32. Moreover, the statements in the January 7 press release were false and misleading because, at the time defendants announced these acquisitions— both of which had been consummated in December 1997—defendants omitted to disclose that their revenue forecast (of $11.2 million) had no reasonable basis as the Company had yet to generate any positive cash flows from these pharmacies. As reported in the Company's Form 10–Q for the period ended March 31, 1998, the Company had negative operating cash flows in the amount of $13.6 million for the first quarter of 1998.

What is completely missing from the plaintiffs' statement of reasons is an allegation that the two pharmacies did not generate $11.2 million. Such an allegation is absolutely fundamental to demonstrating that the press release contained a false statement regarding expected revenues.[3]

---

3. The defendants assert that in fact the reve-

nue projections for all pharmacies were ex-

All that the plaintiffs said about the revenue forecast is that at the time the statement was made the defendants had no reasonable basis for it because the pharmacies had not yet generated any cash flows for PharMerica. Of course, they had not: The pharmacies had just been acquired. Consequently, this alleged reason is vacuous. If the plaintiffs desired to show that the two pharmacies could not reasonably be expected to generate $11.2 million in revenues, the plaintiffs needed to, but did not, allege specific facts about their pre-acquisition revenue-generating histories. In all events, the allegation that the two pharmacies had not generated any cash flows for PharMerica falls miles short of an allegation that the pharmacies did not generate $11.2 million, as the press release said was expected.

The complaint also gave as a reason for alleging that the revenue forecast was false or misleading the fact that PharMerica's Form 10–Q for the period ending March 31, 1998, reported a negative operating cash flow of $13.6 million for the first quarter of 1998. This allegation is clearly beside the point. It does not refer to the two pharmacies that are the subject of the press release and, thus, it plainly does not show that revenues of $11.2 million were not generated by those two pharmacies. Moreover, the defendants point out that the Form 10–Q explained that the negative cash flow resulted primarily from an increase in accounts receivable that had not yet been converted to cash (Doc. 83, p. 7).

The plaintiffs also give as a reason why the press release about expected revenues was false or misleading that the merger between Capstone and PCA was problematic from the outset. Thus, they assert that PharMerica was having problems integrating PCA and Capstone systems, particularly their computer systems.[4]

However, the alleged problems with the Capstone and PCA merger do not demonstrate that it was false or misleading to say that the two pharmacies are expected to generate $11.2 million. The alleged merger problems have no apparent relationship to the revenues expected to be generated by the Sweetwater Pharmacy in Spring Valley, California, and the Hollins Manor Pharmacy in Roanoke, Virginia. Moreover, there are no allegations which attempt to explain why the alleged merger problems make the statements about the expected revenues from the two pharmacies false or misleading. This purported reason, in fact, is so meritless that it underscores the fatal weakness of the plaintiffs' effort to show that the challenged statement was false or misleading.

■ At this point, it is appropriate to note that the alleged merger problems are a recurring theme throughout the complaint. There is the implicit suggestion that the defendants had a general obligation to disclose those problems. That suggestion is incorrect.

■ Rule 10b–5, as pertinent here, renders it unlawful for any person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17

---

ceeded (Doc. 91, p. 7; see Doc. 90, Ex. E). Since there is not a break-down with respect to the individual pharmacies, the defendants' information does not establish that each acquired pharmacy met its expected revenues. It is not necessary, however, for the defendants to make such a showing. They merely had to point out that the complaint did not

allege that the revenues failed to reach the expected levels.

4. For some reason that is not apparent, the plaintiffs alleged these problems in detail in connection with the fourth press release that they challenged, rather than the first one (see Doc. 81, ¶¶ 39, 40).

C.F.R. 240.10b–5(b). Thus, the rule, in addition to prohibiting affirmative false statements, requires the disclosure of facts that would make affirmative statements not misleading. Under this requirement, it is not enough to be actionable for a defendant simply to omit information potentially of interest to investors, but rather the omission must render statements actually made misleading. *In re S1 Corporation Securities Litigation*, 173 F.Supp.2d 1334, 1350 n. 12 (N.D.Ga.2001) (Doc. 100, p. 25 n. 12); *see Clay v. Riverwood International Corp.*, 157 F.3d 1259, 1268–69 (11th Cir.1998) (Rule 10b–5 elements include a showing that "defendant omitted to state facts that would be necessary to make other statements the defendant made not misleading to plaintiff"), *opinion modified on other issues*, 176 F.3d 1381 (11th Cir.1999); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."); *Jensen v. Kimble*, 1 F.3d 1073, 1078 (10th Cir.1993)("As Rule 10b–5 indicates, a manipulative or deceptive omission is an omission which renders the other affirmative statements made by an individual misleading."); *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989)("The express language of 10b–5 only proscribes omissions that render affirmative statements misleading . . . ."). Consequently, the failure to disclose alleged merger problems is not actionable unless the plaintiffs can show that facts that were not disclosed render statements that were made misleading.

As previously demonstrated, the plaintiffs did not show that the nondisclosure of the alleged merger problems caused the statements in the January 7, 1998, press release about expected revenues from two newly-acquired pharmacies to be misleading. And, as will be seen, the same is true for all of the other challenged statements regarding expected revenues from pharmacy acquisitions. Indeed, until the defendants' statements relating to the merger are discussed later, the plaintiffs' reliance upon nondisclosure of alleged merger problems is totally misplaced.

In sum, notwithstanding all that the parties have written and said, the answer to whether the plaintiffs have stated a claim regarding the January 7, 1998, press release is this simple: The plaintiffs have not alleged that the two pharmacies did not generate the expected $11.2 million. Without such an allegation, the plaintiffs cannot show that the press release contained a false or misleading statement regarding expected revenues.

In order to establish that the statement about expected revenues was false or misleading, the plaintiffs would have to demonstrate that the defendants did not genuinely and reasonably believe it at the time it was made. *In re Donald J. Trump Casino Securities Litigation*, 7 F.3d 357, 368 (3rd Cir.1993), *cert. denied*, 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565. There are no allegations in this case that render it conceivable that the plaintiffs could make such a showing without proving that the revenue expectations were not attained.[5] Consequently, the failure to allege that the revenue forecast was not achieved is enough to defeat the contention that the statement about expected revenues in the January 7, 1998, press release (and all similar press releases) was false or misleading.

---

**5.** A contrary conclusion would potentially present the question whether a baseless projection that, in fact, comes true can be considered to be a false statement. That proposition seems doubtful. In all events, the statement would not be actionable because there could not be *detrimental* reliance upon it.

Furthermore, the former Fifth Circuit has said that "[a]n opinion or prediction is actionable if there is a gross disparity between prediction and fact." *First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1314 (5th Cir.1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802. Obviously, a gross disparity with the revenue forecast cannot be shown without an allegation that the revenue expectations were not reached. This confirms that, in the absence of such an allegation, the statement about expected revenues in the January 7, 1998, press release (as well as in similar press releases) is not actionable.

The defendants point out, moreover, that there are other reasons why the claim based upon the January 7, 1998, press release should be dismissed. Specifically, they establish that the challenged statement in that press release falls within the protection of the Reform Act's safe-harbor provisions.

The statement that the two acquired pharmacies "are expected to generate $11.2 million" is undoubtedly a forward-looking statement. The Reform Act defines such statements to include "a statement containing a projection of revenues." 15 U.S.C. 78u–5(i)(1)(A). A statement that the two acquisitions are expected to generate $11.2 million falls squarely within that definition.

■ Consequently, under the Reform Act, the statement is not actionable if it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important fac-

tors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. 78u–5(c)(1)(A)(i); *Harris v. Ivax Corp., supra,* 182 F.3d at 803. The January 7, 1998, press release contained the following statement (Doc. 83, Ex. E, pp. 1–2):

> This release involves forward-looking statements with respect to acquisition prospects, development of preferred provider relationships and other plans and expectations on the part of the company. The accuracy of these statements involves a number of risks and uncertainties, including but not limited to the availability of acquisition prospects and financing for such prospects, changing economic and market conditions that would impact such prospects or financing related thereto, changes in governmental reimbursement regulations and laws which could impair or hinder the entering into of strategic alliances of preferred provider agreements, as well as other risk factors detailed in the company's Securities and Exchange Commission findings [*sic*], to which recipients of this release are referred for additional information concerning the company and its prospects.

With respect to the SEC filings to which the press release intended to refer,[6] the defendants rely upon the statement that the "successful implementation of its growth strategy depends upon its ability to identify, consummate and integrate acquisitions..." (Doc. 83, Ex. A, p. 19; Ex. B, p. 191).[7]

---

6. The word "findings" undoubtedly should be "filings." Anybody who cared enough to pursue the inquiry into SEC materials would recognize this typographical error. All of the press releases at issue, except one, had the same mistake (*see* Doc. 83, Ex. E). The press release of February 9, 1998, got it right (Doc. 57, Ex. F).

7. Public filings with the SEC can be considered on a motion to dismiss in a case of this type. *Bryant v. Avado Brands, Inc., supra,* 187 F.3d at 1275–81. The same is true of press releases that are central to the complaint. *Harris v. Ivax Corp., supra,* 182 F.3d at 802 n. 2. The plaintiffs, accordingly, do not challenge the consideration of the SEC filings and the press releases submitted by the defendants.

These cautionary statements are clearly general, and may even be fairly characterized as "boilerplate," as the plaintiffs contend. On the other hand, a cautionary statement does not have to list all factors that might cause actual results to differ from those in the forward-looking statement, and does not necessarily have to identify the specific factor that led to different results. *Harris v. Ivax Corp., supra*, 182 F.3d at 807.

In this case, the investing public was warned that "[t]he accuracy of these statements [about expected revenues] involves a number of risks and uncertainties ..." (Doc. 83, Ex. E, p. 17). It was further told by SEC filings that successful growth depended upon the ability to integrate the acquisitions (*id.* at Ex. B, p. 191). It is hard to perceive what else the investing public needed to be told to be meaningfully cautioned that the projected revenues of $11.2 million might not be reached. Importantly, the plaintiffs in their memorandum do not identify any risk factors that should have been stated in the cautionary language, but were not, in order to warn more meaningfully the investing public about uncertainties regarding the expected revenues. In this circumstance, therefore, the general cautionary statements provided by the defendants were sufficiently meaningful to bring the statements within the Reform Act's safe harbor. Accordingly, for this reason also, liability cannot be based upon the January 7, 1998, press release.

Furthermore, even if the cautionary statements were inadequate, the plaintiffs' claim is defeated by the other prong of the safe-harbor provisions. Under the Reform Act, a forward-looking statement that is not accompanied by a meaningful cautionary statement cannot be the basis for liability if the plaintiff fails to prove that the statement was made with actual knowledge that it was false or misleading. 15

U.S.C. 78u–5(c)(1)(B). Moreover, the Reform Act requires that the complaint, with respect to each act or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. 78u–4(b)(2). Consequently, with respect to a forward-looking statement, the plaintiffs must allege facts creating a strong inference that the statement was made with actual knowledge that it was false or misleading.

With respect to the statement in the January 7, 1998, press release that the two "acquisitions are expected to generate $11.2 million," the plaintiffs clearly fail to satisfy the heightened pleading requirement. Of course, as indicated, the plaintiffs did not allege that, in fact, the expectation was not met. They did allege that, at the time the statement was made, the defendants omitted to disclose that the revenue forecast had no reasonable basis because PharMerica had not yet generated any revenues from the two pharmacies. This is not only a conclusory allegation that falls short of asserting actual knowledge, but it fails to set forth particular facts creating a strong inference that, when the defendants made the statement, they knew it was false. Although the plaintiffs set forth additional scienter assertions in a section of the complaint, there is no mention in that section of the January 7, 1998, press release (Doc. 81, pp. 53–57). Consequently, that press release cannot be the basis for liability for the additional reason that the complaint fails sufficiently to allege the required state of mind.

2. The plaintiffs have challenged as false or misleading a press release on January 8, 1998, announcing the acquisition of Medical Arts Pharmacy of Pittsburgh. The complaint quotes the following portion of that press release (Doc. 81, p. 16):

The acquisition marks Pharmerica's [*sic*] entry into the Pittsburgh metropolitan area and is expected to generate $8.4 million as a result of services provided to nearly 1,350 beds.

This acquisition is one of a series that reflects Pharmerica's [*sic*] goal of expanding our geographic reach in order to meet the needs of major markets across the country.

PharMerica's cutting-edge technologies enable its consulting pharmacists to capitalize on best practices nationwide..... PharMerica's videoconferencing capabilities connect a nationwide network of PharMerica employees, allowing quicker, more efficient sharing of new information about medications and health care standards.

The complaint gave only the following reasons for asserting that the statements were false or misleading (*id.* at pp. 16–17):

The statements contained in the Company's January 8, 1998 press release were false and misleading for the reasons set out in ¶¶ 31–32 above. Moreover, as was true of the January 7 statement regarding revenue, defendants had no reasonable basis for their statement that this acquisition was expected to generate $8.4 million. The Company, which purportedly consummated the Pittsburgh acquisition in December 1997, already was beginning to experience difficulties in integrating this pharmacy, and others, with the Company. In fact, as of January 8, 1998, the Company had yet to generate any positive cash flows from these pharmacies and as ultimately reported in the Company's Form 10–Q for the period ended March 31, 1998, the Company had negative operating cash flows in the amount of $13.6 million for the first quarter of 1998.

The only portion of the press release that the plaintiffs attack is the expected revenues of $8.4 million. The challenge to this statement is deficient for the same reasons that the challenge to the January 7, 1998, press release failed.

First (and dispositively), the plaintiffs do not allege that the Pittsburgh pharmacy did not generate $8.4 million. Therefore, as previously explained, *supra,* pp. 1230–31, they have not alleged a false or misleading statement.

The plaintiffs allege that PharMerica was beginning to experience difficulties in integrating the Pittsburgh pharmacy with the company. This conclusory assertion is not supported by any facts explaining what those difficulties were and what bearing they had on the Pittsburgh pharmacy's expected revenues. This allegation therefore does not remedy the absence of an allegation that the expectation of $8.4 million in revenues was not attained.

Further, the statement is plainly forward-looking and thus covered by the safe harbor. The press release contained the same language as the prior press release identifying the statement as forward-looking and pointing out that "[t]he accuracy of the statements involves a number of risks and uncertainties" (Doc. 83, Ex. E, p. 4). Although, as indicated previously, the cautionary language was general, it would appear to be sufficiently meaningful, particularly in the absence of any identification by the plaintiffs in their memorandum of a risk factor that should have been identified, but was not. Accordingly, the cautionary-language prong of the safe-harbor provisions would defeat liability based upon the January 8, 1998, press release.

In addition, the plaintiffs have not alleged facts creating a strong inference that the statement about revenue expectation in the press release was made with actual knowledge that it was false or misleading. The statement of reasons quoted above does not contain any such particularized allegations. Further, there are no

allegations in the scienter section of the complaint about the January 8, 1998, press release (Doc. 81, pp. 53–57). Accordingly, that press release is not actionable because the complaint lacks allegations demonstrating that it contained a false or misleading statement that was made with actual knowledge that it was false or misleading.

3. The plaintiffs assert that a January 15, 1998, press release announcing the acquisition of a North Carolina pharmacy contains false or misleading statements. The complaint quoted the following language from that press release (Doc. 81, p. 17):

> The acquisition is expected to generate $14.5 million as a result of services provided to approximately 3,800 beds.
>
> This and our other recent acquisitions fulfill our strategic goal of acquiring quality pharmacies in key geographic markets.

The plaintiffs gave these reasons in the complaint for asserting that this press release contained false or misleading statements (*id.* at pp. 17–18):

> The statements contained in the Company's January 15, 1998 press release were false and misleading for the reasons set out in ¶¶ 31–32 above; namely that defendants had no reasonable basis for their statement that this acquisition was expected to generate $14.5 million; the merger between PCA and Capstone was already proving to be problematic; the Company already was beginning to experience difficulties in integrating this pharmacy, and its others, with the Company; and, the Company had yet to generate any positive cash flows from

these pharmacies, ultimately reporting in the Company's Form 10–Q for the period ended March 31, 1998 that the Company had negative operating cash flows in the amount of $13.6 million for the first quarter of 1998.

These reasons challenge only the statement that the acquisition was expected to generate $14.5 million.[8] The complaint contains no allegation that the pharmacy did not generate $14.5 million. The reasons given for asserting that the press release is false or misleading are merely a serial listing of those reasons that have already been considered and found insufficient. Notably, there are no specific facts alleged about the North Carolina pharmacy. Thus, the plaintiffs have failed to allege facts showing that the statement in the January 15, 1998, press release about the expected revenues was false or misleading.

Furthermore, the statement in the press release about expected revenues was clearly a forward-looking statement and it was accompanied by the same cautionary language contained in the earlier press releases (Doc. 83, Ex. E, p. 6). While, as noted, the cautionary language was general, the plaintiffs have again failed to identify any specific risk factor that should have been identified, but was not. Thus, under the safe-harbor provisions, the statement about expected revenues does not appear to be actionable.

In addition, the plaintiffs have not alleged any facts either in the statement of reasons or in the scienter section that would create a strong inference that the defendants made the statement about ex-

---

8. As previously indicated, language in press releases as to which no attempt is made to show that it is false or misleading is appropriately disregarded. Nevertheless, it is noteworthy that the comments that the recent acquisitions "fulfill our strategic goal of ac- quiring quality pharmacies in key geographical markets" and that they "enable PharMerica to meet customer needs nationwide" are, at most, immaterial and non-actionable puffing. *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir.1997).

pected revenues with actual knowledge that it was false or misleading. Therefore, the statement cannot be a basis for liability due to the alternative prong of the safe-harbor provisions.

4. The plaintiffs contend that a press release of January 20, 1998, contained false and misleading statements about the acquisition of Express Pharmacy Services (EPS) and Tmesys, Inc.[9] The only language quoted from the January 20, 1998, press release is the following (Doc. 81, p. 18):

> Other acquisitions announced this month include pharmacies in North Carolina, Virginia, Pennsylvania and California.
>
> With an average annual growth rate of 21% since 1993, EPS and Tmesys are expected to generate more than $30 million in revenue this year.

Since, as the prior press releases establish, the first sentence is obviously not actionable, the false or misleading statements are limited to the second sentence. Moreover, there is no allegation that it was false or misleading to say that the two organizations had an annual growth rate of 21% since 1993. Accordingly, the alleged false or misleading statement is limited to the expectation that EPS and Tmesys would generate $30 million in revenues in 1998.

The plaintiffs purport to provide seven pages of reasons why the statement in the January 20, 1998, press release was false or misleading (Doc. 81, pp. 18–25). However, EPS and Tmesys are not even mentioned in those seven pages. Rather, the complaint at that point alleges at length

various operational problems encountered by PharMerica. Thus, the complaint asserts that (1) "[t]here were significant and pervasive problems associated with merging the computer systems of Capstone and PCA" (*id.* at p. 20); (2) "[t]he Company was unable to properly bill customers for healthcare products provided and also did not adequately pursue the accounts once due" (*id.* at p. 21); (3) "[t]he Company had set unrealistic, unattainable goals and budgets for many of its pharmacies" (*id.* at p. 22); (4) "[t]he reported revenue on monthly reports were [*sic*] arbitrarily increased" (*id.*); (5) "[s]ome of PharMerica's accounts . . . were bogus" (*id.*); (6) "PharMerica was having severe problems integrating its systems with the systems of the acquired pharmacy operations" (*id.* at p. 23); and (7) "PharMerica was having severe problems with inventory controls and efficiency" (*id.* at p. 24). These allegations, for the most part, had nothing to do with the acquisition of pharmacies, and, in all events, they are devoid of any connection with EPS and Tmesys.

As previously indicated, *supra*, pp. 1229–30, the defendants did not have a general duty to disclose these alleged operational problems. Rather, the problems only needed to be disclosed if that was necessary to make affirmative statements not misleading. Plainly, a statement that EPS and Tmesys are expected to generate $30 million in revenues has no connection with the alleged difficulties attendant to the PCA–Capstone merger. Consequently, the January 20, 1998, press release did

9. In the same paragraph, the plaintiffs mention a press release of January 29, 1998, announcing the acquisition of Goot Pharmacy in Phoenix, Arizona. They do not quote any language from that press release, although the acquisition was expected to generate $7.1 million (Doc. 83, Ex. E, p. 10). Under the Reform Act, the failure to identify any alleged false or misleading statement in the press release and the failure to give reasons why a statement was false or misleading precludes any liability arising from the January 29, 1998, press release. 15 U.S.C. 78u–4(b). Of course, in light of the absence of any allegation about the acquisition of the Goot pharmacy, the press release would not be actionable for all of the reasons previously explained with regard to the earlier press releases.

not give rise to a duty to disclose problems relating to the merger.

As noted, the lengthy allegations did include the assertion that "PharMerica was having severe problems integrating its systems with the systems of the acquired pharmacy operations" (Doc. 81, p. 23). However, with respect to this assertion, all that the plaintiffs alleged was the following (*id.*):

> For example, the Company was having problems assimilating the human resource departments of its acquired pharmacies. Former employees who had left the Company were still receiving paychecks and receiving benefits weeks after they had left the Company. Further, the Company was experiencing extensive problems integrating employee medical and 401K benefits plans from acquired pharmacies into PharMerica's employee medical and 401K benefit plans.

These alleged problems have no apparent bearing on the statement that EPS and Tmesys were expected to generate $30 million in revenues. Accordingly, the problems (assuming they were even material) did not have to be disclosed in order to make the statement about the expected revenues not misleading.[10]

Despite the seven pages of allegations about the operational problems, what the plaintiffs did not allege is that EPS and Tmesys did not achieve $30 million in revenues in 1998. In other words, they failed to allege that the forward-looking statement did not come true. Without this allegation, the January 20, 1998, press release cannot support the plaintiffs' claim

because it does not contain a false statement. *See, supra,* p. 1230–31.

In addition, the safe-harbor provisions preclude liability for the press release. The statement regarding expected revenues is clearly forward-looking. The press release, accordingly, notes that it "involves forward-looking statements with respect to acquisition prospects, . . . and expectations on the part of the company" (Doc. 83, Ex. E, p. 9). It contains the same general cautionary language as the prior press releases. That language is sufficiently meaningful in view of the plaintiffs' failure to identify any particular risk factor that should have been specified but was not.

Furthermore, even in the absence of meaningful cautionary language, the statement of revenue expectations in the January 20, 1998, press release would not be actionable under the safe-harbor provisions because the plaintiffs have not adequately alleged that it was made with actual knowledge that it was false. Despite the seven pages of alleged reasons, the plaintiffs merely repeat the patently insufficient assertion that the defendants must have known it was false since the company had not yet received any positive cash flow and subsequently reported for the first quarter of 1998 an overall negative cash flow of $13.6 million. As previously explained, these assertions do not show that the defendants had actual knowledge that projected revenues of $30 million for EPS and Tmesys would not be realized. Significantly, there are no allegations in the seven pages of purported reasons, or in the scienter section, addressing EPS and Tmesys and demonstrating why the defen-

---

10. The lengthy statement of reasons also mentioned that "PharMerica had acquired many pharmacies located in close proximity to each other" with the result that there was "extensive waste and duplication" (Doc. 81, p. 24). In connection with another challenge, these alleged nondisclosures are considered in de-

tail and found not to be material (*see, infra,* pp. 82–83). In all events, these alleged problems, even if material, clearly did not need to be disclosed in order to make the statement about expected revenues from EPS and Tmesys not misleading.

dants knew that the forecast for those two organizations would not be achieved. Especially since the plaintiffs have not even alleged that EPS and Tmesys did not have revenues of $30 million in 1998, they have clearly failed to allege the requisite mental state with respect to the asserted falsity of the statement about those expected revenues.

5. The plaintiffs challenge in a press release of February 9, 1998, the statement that "[d]uring the fourth quarter we acquired pharmacy operations which will add approximately $34 million in annualized revenues and expand our service coverage in several key states" (Doc. 81, p. 26).[11] The plaintiffs, however, do not allege any specific facts showing that this statement about acquired pharmacies was false or misleading. Thus, no facts are set forth showing that revenues of approximately $34 million were not achieved in 1998 by pharmacies acquired during the fourth quarter of 1997, or that the service coverage was not expanded in several key states. Thus, this statement in the February 9, 1998, press release cannot support a claim because the plaintiffs have failed to show that it was false or misleading.

Moreover, the statement about expected revenues is forward-looking and protected by the safe-harbor provisions. The press release contains virtually the same cautionary language (Doc. 57, Ex. F), which, although general, appears meaningful in light of the plaintiffs' failure to identify a particular risk factor that should have

been included. In all events, the plaintiffs have not alleged any facts either in the supporting reasons or the scienter section that would raise any inference, much less a strong one, that the defendants made the statement about expected revenues with actual knowledge that it was false or misleading.

6. A press release on February 18, 1998, announced the acquisition of Kentucky Health Services, Inc., with expected revenues in 1998 of $20.6 million. The plaintiffs allege that this press release was false or misleading for the reasons given for the press release of January 20, 1998 (Doc. 81, p. 28). Those reasons have been considered and found wanting.[12]

The plaintiffs' reasons are also insufficient here. Importantly, the plaintiffs do not allege that revenues of $20.6 million were not achieved. Thus, as previously explained, *supra*, pp. 1230–31, they have failed to allege a false statement.

Further, the statement is protected by the safe-harbor provisions. In this instance, however, the defendants, probably inadvertently, have failed to include all of the press release, so that the materials submitted do not have cautionary language (*see* Doc. 83, Ex. E, p. 11B). Nevertheless, the plaintiffs did not allege any facts regarding the Kentucky acquisition that would satisfy the Reform Act's requirement that the plaintiffs show that a false or misleading statement was made about expected revenues with actual knowledge that it was false or misleading.

---

11. The plaintiffs also challenge statements in the press release relating to the merger. Those statements will be considered separately. *See, infra*, pp. 1242–46.

12. The plaintiffs added the conclusory allegation that larger acquisitions, such as the Kentucky operation, had larger operational problems and costs, and that the defendants failed to disclose that circumstance. Such an obvious circumstance need not be disclosed. *See,*

*infra*, pp. 1254–55. In addition, this allegation is unsupported by any facts showing that the Kentucky acquisition encountered significant problems, or that, when the press release was issued, the defendants knew that the specific problems would arise. Further, there is no explanation how the failure to state that larger acquisitions have larger operational problems and costs made the statement about expected revenues false or misleading.

7. The plaintiffs challenge as false or misleading a press release of February 27, 1998, announcing the acquisition of Frank's Pharmacy and Medical Supply in Detroit (Doc. 81, p. 29). The press release stated that this "acquisition is expected to generate annual revenues of approximately $5.8 million" (Doc. 83, Ex. E, p. 12).

The complaint does not allege that the acquisition did not generate revenues in 1998 of about $5.8 million. Thus, for the reasons set out earlier, *supra*, pp. 1230–31, the plaintiffs fail to allege a false statement.

The plaintiffs do assert, in addition to the reasons previously given and found wanting, that "the Company was encountering tremendous difficulty in integrating the other newly-acquired pharmacies" (Doc. 81, p. 30). However, they do not allege any facts supporting this conclusory contention. As noted previously with respect to a similar assertion, the plaintiffs alleged only that some employees were still receiving paychecks and benefits weeks after they had left the company and that there were extensive problems integrating employee medical and 401K benefit plans. There is nothing about those circumstances that casts any doubt upon the truthfulness of the statement that the Detroit pharmacy was expected to generate revenues of $5.8 million in 1998.

The statement about expected revenues in the February 27, 1998, press release is also protected by both prongs of the safe-harbor provisions. The forward-looking statement was accompanied by the same cautionary language, which was sufficiently meaningful in view of the plaintiffs' failure to identify any risk factor that warranted being included. Further, there were no facts alleged that would demonstrate that the defendants actually knew that the statement about expected revenues was false or misleading when it was made.

■ 8. With respect to acquisitions, the plaintiffs also challenge press releases of March 3 and 5, 1998.[13] Unlike the prior contentions, however, the plaintiffs do not attack the statements in those press releases about expected revenues.[14]

With respect to the March 3, 1998, press release, the plaintiffs identified the following as a false or misleading statement (Doc. 81, p. 30):

This acquisition, along with our other recent string of pharmacy transactions, continues PharMerica's dynamic growth and adds enhanced value for our customers and investors.

Similarly, in the March 5, 1998, press release, the plaintiffs specify the following language (*id.* at p. 32):

These acquisitions support our strategy of becoming a key player in nationwide markets. By including these companies in our family of pharmacy services, PharMerica adds value for our customers and investors.

The statements that the acquisitions reflect "dynamic growth" and add "enhanced value for our customers and investors" are within the class of statements that are not actionable. As the Tenth Circuit explained in *Grossman v. Novell, Inc.*, 120

13. In the complaint, the plaintiffs challenge a press release purportedly issued on March 6, 1998 (Doc. 81, p. 32). The press release to which they refer, however, was dated March 5, 1998 (Doc. 83, Ex. E, p. 16).

14. While the plaintiffs quoted the sub-heading of the March 5, 1998, press release, which stated that "Acquisitions Expected to Gener-ate Annual Revenues of Nearly $7 Million," it does not appear that this statement was a subject of challenge (Doc. 83, Ex. E, p. 16). However, even if it were, the challenge would be unsuccessful for the same reasons as the prior challenges, namely, the failure to allege that the revenue projection was not attained, and the protections of both prongs of the safe-harbor provisions.

F.3d 1112, 1119 (10th Cir.1997)(footnote omitted):

> Statements classified as "corporate optimism" or "mere puffing" are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification. Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions.

In other words, "courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1217 (1st Cir.1996).

This principle is even more significant in cases, such as this, which are based on a fraud-on-the-market theory of liability. *Id.* at 1218. This is because "a claim that a fraud was perpetrated on the *market* can draw no sustenance from allegations that defendants made overly-optimistic statements, if those statements are ones that any reasonable investor (*ergo*, the market) would easily recognize as nothing more than a kind of self-directed corporate puffery. The market is not so easily duped, even granted that individual investors sometimes are." *Id.* (emphasis in original).

The comment in the March 3, 1998, press release that the pharmacy acquisition "continues PharMerica's dynamic growth" is clearly not actionable. In the first place, it appears to be a fair characterization of the numerous pharmacy acquisitions within the preceding short period of time, and the statement is thus not false or misleading. In any event, the statement is no more than immaterial puffery that could not reasonably have had an effect upon the market. *See Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir.1997)("any misrepresentation regarding the Defendants' prediction of 'significant growth' is immaterial"); *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir.1995)("indefinite predictions of 'growth' are better described as puffery rather than as material statements of fact").

Similarly, the statements that the particular acquisition "adds enhanced value" or "adds value" are non-actionable puffery. The statements are simply devoid of any substantive content. Thus, the extent of the added value is neither quantified nor specified in any way. The use of the word "enhanced" in one instance is simply a redundancy of the word "add," and thus provides no greater content. Accordingly, the vague and non-defined statements that the acquisitions added value are not material since they could not reasonably have been relied upon by the market.[15] *See Parnes v. Gateway 2000, Inc.*, *supra*.

---

15. It is noted that the parties do not meaningfully address the statements about "dynamic growth" and "adds value" in their memoranda. The plaintiffs mentioned them only in passing (Doc. 89, pp. 1, 4, 24), while the defendants did not seem to address them at all. Neither side provided any significant argument whether or not certain statements were puffery or were otherwise immaterial. This is merely one example where the parties' use of the broad-brush approach has made it much more difficult to evaluate the specific statements alleged in the complaint to be false or misleading.

It is noted further that the plaintiffs cannot demonstrate that the statements about "dynamic growth" and "added value," assuming they are actionable, are false or misleading by alleging operational problems (Doc. 81, pp. 30–31, 33). As explained later, not only are these problems overstated, but at most they are simply matters of corporate mismanage-

9. The defendants, on April 15, 1998, issued a press release announcing the acquisition of The Chamberlain Group from Virginia. The plaintiffs challenge as false and misleading the following statement (Doc. 81, p. 36):

> This acquisition, along with our other recent string of pharmacy transactions, continues PharMerica's dynamic growth and adds enhanced value for our customers and investors. The acquisition of Whitney Village Pharmacy is in keeping with PharMerica's goal to create highly-efficient pharmacy networks in key metropolitan markets.

This language, however, does not appear in the press release (*see* Doc. 83, Ex. E, pp. 18–20). Rather, it is part of the press release of March 3, 1998 (*id.* at p. 14). There is no reference in the April 15, 1998, press release to "dynamic growth" or "enhanced value." Further, there is no mention of expected revenues. Having failed to identify an alleged false or misleading statement in the April 15, 1998, press release, the plaintiffs obviously cannot base a claim upon it.

10. The plaintiffs challenge as false and misleading a press release of July 9, 1998, announcing the acquisition of two pharmacies. The alleged false and misleading language was identified as the following (Doc. 81, p. 48):

> PharMerica ... is expanding its pharmacy network with the acquisition of Apothecare Pharmacy Inc. in Tampa, Fla. and Greenville Pharmacy in Portland, Conn.... The acquisitions are expected to generate $2 million of annual revenues each.

In their reasons why this statement was false or misleading, the plaintiffs, once again, fail to allege that the acquisitions did not achieve the expected revenues (*id.* at pp. 48–49). Thus, as explained before, they have not shown that the challenged statement was false.

The only notable contention with respect to this press release is the assertion that the use of the word "expanding" was misleading because the defendants failed to disclose that the company was planning to close or dispose of five major pharmacies (*id.* at p. 49). This contention is meritless for several reasons. In the first place, the context of the press release shows that the word "expanding" referred to geographical reach, not numbers of pharmacies (Doc. 83, Ex. E, p. 21). Further, the company's Form 10–Q filed with the SEC on May 15, 1998, stated that, in connection with a restructuring plan, the company intended to close six former PCA pharmacies, and fourteen former Capstone pharmacies, thereby alerting the public to the fact that pharmacies it operated might be closed (Doc. 73, Ex. A, note 7). In addition, the press release stated that PharMerica operated "more than 160 pharmacy facilities" (Doc. 83, Ex. E, p. 21), which was a number greater than indicated in earlier press releases, and which was not challenged by the plaintiffs. In all events, the closing of five pharmacies would have no bearing on

---

ment and the failure to disclose such matters does not state a federal securities law claim. *See infra*, pp. 54–60. Further, the challenged statements in the press releases of March 3 and 5, 1998, cannot be shown to be misleading by reference to reports issued more than two months later stating that the company had a negative cash flow for the first quarter of 1998, particularly since a significant reason for the negative cash flow was an increase in accounts receivable (Doc. 83, Ex. D). In addition, the plaintiffs have not alleged facts creating a strong inference that the press releases of March 3 and 5, 1998, were issued with severe recklessness. Thus, no specific circumstances are alleged regarding the issuance of those press releases, and, as explained later, *infra*, pp. 70–73, 95, the plaintiffs' general allegations of scienter are insufficient.

the statement that the two acquisitions were expected to generate $2 million each.

Moreover, the statement of expected revenues is protected by the safe-harbor provisions for reasons previously explained. Thus, the press release had cautionary language and that language, while general, appears meaningful in light of the plaintiffs' failure to specify any risk factors that should have been mentioned. Further, because neither the purported reasons nor the scienter section of the complaint contain any allegations about the two pharmacies, the complaint plainly does not set forth facts creating a strong inference that the statement about expected revenues was made with actual knowledge that it was false or misleading.

11. In sum, the plaintiffs have clearly failed in their attempt to build a case of fraud upon the press releases announcing the acquisitions of pharmacies. The challenges based upon those press releases, for the most part, attacked statements of expected revenues. Those challenges were deficient because in no instance did the plaintiffs allege the essential fact that the revenue forecasts were not reached. As to the three challenges that were not based on statements about expected revenues, two were meritless because the statements attacked were mere puffery, and one was

flawed because the plaintiffs copied language from the wrong press release.[16]

In addition, the statements about expected revenues would be protected by the safe-harbor provisions. It may be arguable whether the cautionary language in the press releases is adequate because it is general. However, particularly since the plaintiffs have failed to identify any specific risk factors that should have been mentioned, it seems to me that the cautionary language is meaningful. In all events, the safe harbor covers the statements about expected revenues because the plaintiffs have plainly failed to allege facts raising a strong inference that the statements were made by the defendants with actual knowledge that they were false or misleading.

For these reasons, the plaintiffs' claims based upon press releases announcing the acquisitions of pharmacies are clearly insufficient and should be rejected. Significantly, that theory seemed to be the primary predicate for this lawsuit.

C. The plaintiffs also allege that other false or misleading statements were made in three SEC filings and two press releases. Those materials, and the challenged statements in them, will be considered in the order in which they appear in the complaint.

16. The plaintiffs, in challenging an announcement of financial results in a press release of May 4, 1998, refer to a statement in the first quarter of 1998 were expected to generate $67 million in annualized revenue (Doc. 81, p. 37). The plaintiffs do not appear to have specified this as a false or misleading statement, and, thus, under the Reform Act, it cannot be the basis for a claim. 15 U.S.C. 78u–4(b)(1). In any event, the claim would be insufficient because there are no allegations that the revenue expectations were not achieved, and there are no facts alleged showing actual knowledge by the defendants that the statement was false or misleading. (Because the defendants did not include the May 4, 1998, press release—at least

where it could be reasonably found—the cautionary-language prong of the safe-harbor provisions is not applicable.)

The plaintiffs also mention in one paragraph of the complaint press releases in June and July 1998 announcing three additional acquisitions (Doc. 81, p. 47). The plaintiffs, however, did not purport to identify any false or misleading statements from those press releases. Accordingly, under the Reform Act, a claim cannot be based upon those press releases. 15 U.S.C. 78u–4(b)(1). Moreover, it would seem that any such claim would be insufficient for the same two reasons mentioned with respect to the May 4, 1998, press release.

■ 1. A press release on February 9, 1998, announced fourth quarter and year-end financial results for 1997 (Doc. 57, Ex. F). To the extent not already discussed, *supra*, p. 1237, the following language is challenged (Doc. 81, p. 26):

> The record levels of revenues and earnings before non-recurring charges reported for the fourth quarter and twelve months of fiscal 1997 reflect the continuing strong operating trends of our Company and the successful consummation of the merger announced last year. I am pleased to report that we have achieved the milestones in connection with the merger which we anticipated would be completed by year end.
>
> .　　.　　.　　.　　.
>
> Our commitment is to provide superior pharmacy services to our patients while creating value for our shareholders.

The statements relating to the "successful consummation of the merger" and the achievement of "milestones in connection with the merger" do not support a claim of fraud for several reasons.

In the first place, they are simply too inconsequential or ambiguous to have been relied upon by the market. *See Parnes v. Gateway 2000, Inc., supra*, 122 F.3d at 547. Thus, the reference to the successful consummation of the merger seems to indicate merely that the transaction resulting in the merger had been concluded. In this respect, the press release reworded the point to be that "[t]he Company successfully completed the combination of Pharmacy Corporation of America and Capstone Pharmacy Services, Inc." (Doc. 57, Ex. F, p. 4). This cannot reasonably be taken to mean that all of the operational details arising from the merger were finished. Of course, if, as it appears, the statement that there was a successful consummation of the merger denotes only that the merger transaction was completed, there is no allegation that such a statement was false or misleading.

The statement that the company "ha[d] achieved the milestones in connection with the merger which we anticipated would be completed by year end" is virtually meaningless in the absence of some indication of what the milestones were. It is not reasonable to think that the market would have given any weight to such an empty statement. *Parnes v. Gateway 2000, Inc., supra*, 122 F.3d at 547.

In any event, even assuming that the statements about the merger carried some meaning beyond just that the transaction had been completed, the plaintiffs have failed to show the statements support a claim of fraud. The plaintiffs attempt to make such a showing through their allegations regarding the operational problems arising from the merger (Doc. 81, pp. 26–27). Thus, as reasons why the statements were false or misleading, the plaintiffs assert that "there were severe problems integrating the computer systems of Capstone and PCA, inadequate billing of customers or pursuing accounts receivables, setting unattainable budgets in different regions, arbitrarily increasing reported revenues on monthly reports, claiming non-existent accounts and retaining known credit risks, integrating the Company's computer system with the systems of acquirees and managing regional pharmacy networks efficiently" (Doc. 81, pp. 26–27).

These assertions are not actionable because they allege only corporate mismanagement, not fraud. Based upon *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), courts generally hold that the failure to disclose possible corporate mismanagement does not state a federal securities law claim. *Haft v. Eastland Financial Corp.*, 755 F.Supp. 1123, 1131 (D.R.I.1991); *see also*

In re United Telecommunications, Inc., Securities Litigation, 781 F.Supp. 696, 699 (D.Kan.1991) ("Federal courts have interpreted [Santa Fe] to preclude federal claims based upon nondisclosure of mismanagement."); Charas v. Sand Technology Systems Int'l, Inc., 1992 WL 296406 *6 (S.D.N.Y.1992) (Doc. 83, App., Tab G) (failure to disclose breaches of fiduciary duty and corporate mismanagement is not misrepresentation sufficient to constitute a violation of federal securities laws). As the Third Circuit stated in Craftmatic Securities Litigation v. Kraftsow, 890 F.2d 628, 640 (3d Cir.1989), "[w]here the incremental value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities acts." Consequently, that court dismissed allegations, similar to those asserted here, that the defendants did not disclose that the company was "unfocused" and unable to manage present business, that its costs were out of control and its cost controls were ineffective, that its financial reporting and accounting controls were inadequate and ineffective, and that its information systems were wholly inadequate. Id.

Similarly, the court in In re United Telecommunications, Inc., Securities Litigation, supra, 781 F.Supp. at 698–700, dismissed as mere claims of mismanagement allegations of billing problems that were delaying collections, problems with controlling expenses, deficient internal controls and management information systems necessary to maintain costs, failure to make write-downs for outdated and obsolete software, and problems with realignment of the work force. And the court in In re Donna Karan International Securities Litigation, 1998 WL 637547 *9–10 (E.D.N.Y.1998) (Doc. 83, App., Tab P), based upon the principle "that allegations constituting nothing more than assertions of general mismanagement or nondisclo-

sures of mismanagement, cannot support claims under § 10(b) of the Exchange Act," dismissed allegations of cost-control problems and allegations that expressly assailed the conduct, judgment and abilities of management.

■ As indicated, the plaintiffs' claim that the February 9, 1998, press release was false or misleading because the defendants failed to disclose that "there were severe problems integrating the computer systems of Capstone and PCA, inadequate billing of customers or pursuing accounts receivables, setting unattainable budgets in different regions, arbitrarily increasing reported revenues on monthly reports, claiming non-existent accounts and retaining known credit risks, integrating the Company's computer system with the systems of acquirees and managing regional pharmacy networks efficiently" (Doc. 81, pp. 26–27). These assertions plainly constitute, at most, allegations of mismanagement. The decisions just cited show that, both before and after the Reform Act, very similar allegations were held not to state a violation of the federal securities laws. Those decisions establish that the same conclusion is warranted here.

Moreover, the propriety of rejecting the claim based upon the February 9, 1998, press release becomes even clearer when the specific facts supporting the allegations of operational problems are examined. The primary paragraph (¶ 40) sets forth those allegations in seven subparagraphs, each headed by a sentence that purports to characterize the factual allegations (Doc. 81, pp. 20–24). It seems to me that each of those sentences overstates the facts supporting it.

For example, the plaintiffs rely heavily upon the assertion that "there were significant and pervasive problems associated with merging the computer systems of

Capstone and PCA" (*id.* at p. 20).[17] In support of that allegation, the plaintiffs alleged (*id.* at pp. 20–21):

According to a former computer Help Desk analyst for PharMerica, PCA operated on an AS400 system platform, while Capstone operated on an RIS system (RS6000) in all of its locations except Parsons, Tennessee. As a result, Capstone's entire network had to be upgraded before their systems could communicate with PCA's system. Capstone was also still using 386mhz, and in some places, 286mhz computers, which required massive upgrades. A byproduct of the different platforms caused significant problems with billing. Each pharmacy was supposed to download a "daily save" to a central computer in Tampa, Florida but this could not be done because the different systems could not communicate with each other. The integration problems were so severe that PharMerica opted to convert some of the old PCA locations to the RIS system, creating a multitude of problems with PCA pharmacies (A PCA pharmacy in Beltsville, Maryland was particularly affected). The conversion to the RIS system was done in the Northeast because one of Capstone's largest facilities was located in Massachusetts and PharMerica decided to focus on converting the smaller pharmacies first. According to the former analyst for PharMerica, PCA's MIS department knew that integrating Capstone's & PCA's computer systems would be a nightmare several months before the merger. Indeed, after the merger, when a non-PCA pharmacy would call PharMerica's Help Desk for assistance, they could not be provided assistance because of the lack of resources due to the incompatible computer systems.

These allegations, in general, do not appear to rise even to the level of corporate mismanagement. Rather, they seem to indicate an unsurprising situation involving a merger of two companies that had different computer systems. Operating difficulties would normally be expected in that circumstance.

Notably, the plaintiffs do not allege any specific economic impact from the use of different computer systems. The most they assert is that this caused "significant problems" with billing. They did not allege, however, that billing could not be accomplished.

Similarly, no adverse consequence is alleged with respect to the inability to download a "daily save." Thus, there is no allegation that there was a computer malfunction that required the use of the "daily save."

Furthermore, with respect to the inability of a non-PCA pharmacy to call the Help Desk for assistance, the press release did disclose an inadequacy in the information system. The press release states that "[t]he Profiles Plus database [which is described as a material data warehouse that tracks drug use trends and identifies drug therapy problems] is currently linked to approximately fifty percent of our pharmacies" and that "[d]uring the next ninety days, we anticipate that approximately seventy percent of our remote pharmacy locations will be linked to our corporate financial system and Profiles Plus database" (Doc. 57, Ex. F, pp. 2–3). Whether or not these statements specifically respond to the matter of calls to the Help Desk, they certainly convey the idea that

---

**17.** It is noted that, in connection with the February 9, 1998, press release, the plaintiffs alleged that there were "severe" problems integrating the computer systems (*id.* at p. 26). Which was it: Significant or severe?

the company's information system was not operating at anywhere near one hundred percent efficiency.

The other alleged operational problems similarly do not support a claim of fraud. Thus, it hardly seems to suggest fraud that the defendants did not disclose that some sales representatives somewhere (maybe in Texas) were taking handwritten orders without entering them into the computer system; that monthly goals were set too high in Waco and Tyler, Texas; that a southeast regional sales manager set expected revenues per bed for nursing home patients that were much higher than before; that PharMerica re-established business with a company that had a bad credit history; that it incorrectly claimed certain Midwest nursing homes as accounts (although there is no allegation it made such a claim to the investing public); that some employees still got paychecks weeks after leaving the company; or that trucks from two pharmacies in Colorado passed each other.

These matters seem to be no more than common business failings and can hardly be characterized as mismanagement at the corporate level. But even if they were viewed as corporate mismanagement, the failure to disclose such problems, as previously explained, would not amount to a violation of Rule 10b–5. Certainly, there is nothing about those problems that would render inapposite the general rule that allegations of nondisclosure of mismanagement do not state a federal securities law claim. *See Craftmatic Securities Litigation v. Kraftsow, supra,* 890 F.2d at 640.

The February 9, 1998, press release additionally cannot support a Rule 10b–5 claim because the plaintiffs have not alleged particular facts giving rise to a strong inference that the statements were made with the required state of mind. Although, as indicated, the statements about "successful consummation of the merger" and the achievement of "milestones" did not have sufficient content to make them actionable, it was assumed for purposes of further analysis that they did. It will be assumed further with respect to scienter that any actionable meaning those statements convey is not forward-looking. Accordingly, the plaintiffs need to establish that the defendants issued the statements with severe recklessness. Thus, the statements must be "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant[s] or is so obvious that the defendant[s] must have been aware of it." *Bryant v. Avado Brands, Inc., supra,* 187 F.3d at 1282 n. 18. That standard is plainly not met with respect to the February 9, 1998, press release.

The complaint does not allege any facts addressing the defendants' mental state in the statement of reasons section (Doc. 81, pp. 26–27). Moreover, the scienter section of the complaint does not contain any specific allegations about the press release (*id.* at pp. 53–57). While that section does contain general (and as will be seen, *infra,* pp. 1249–50, insufficient) allegations of scienter, it is unnecessary to evaluate those allegations here because, in all events, the circumstances surrounding the February 9, 1998, press release do not give rise to a strong inference of scienter.

The press release announced "record levels of revenue and earnings" for 1997 and for the fourth quarter of that year (Doc. 57, Ex. F, p. 2). In that situation, there would be no significant reason to hide bad news about operational problems. To the contrary, assuming that the information was material, that would be a good opportunity to disclose it.

Furthermore, the merger had been in effect for only a few weeks. There is no reason to think that at that point the defendants would believe that the market would be troubled by operating difficulties.

In addition, the defendants have not alleged specific dates concerning the operational problems. Thus, the complaint does not show that, by February 9, 1998, the defendants even had knowledge of most of the operational problems that have been alleged. While the defendants may have been aware of the different computer systems used by PCA and Capstone, at that early stage of the merger they reasonably could have thought that the problem could be resolved, or minimized.

Moreover, the press release did disclose problems with the information system. In particular, it stated that, even after an additional ninety days, thirty percent of the remote pharmacy locations would not be linked to the corporate financial system, as well as to the Profiles Plus database (Doc. 57, Ex. F, p. 3). This disclosure, by itself, contradicts the plaintiffs' claim of scienter with respect to the February 9, 1998, press release.

In that press release, the plaintiffs also challenge the statement that "[o]ur commitment is to provide superior pharmacy services to our patients while creating value for our shareholders" (Doc. 81, p. 26). That statement is nothing more than a corporate goal. It is plainly not the type of hard statement that is actionable. See Parnes v. Gateway 2000, Inc., supra, 122 F.3d at 547. The fact that the statement uses the word "value" does not make it something more than an aspiration. Consequently, it is unreasonable to think that the market would have given the statement any significance.

Moreover, assuming the statement had some substance, in order to show that it was false, the plaintiffs would have to prove, in effect, that the whole operation was a fraud and that, therefore, there was no commitment to create value for the shareholders. That has not even been suggested, much less alleged.

Similarly, there are no allegations that raise a strong inference that the commitment to create value for the shareholders was made with severe recklessness.

For these reasons, and those stated earlier, supra, p. 1237, the press release of February 9, 1998, does not support a claim of fraud.

2. The plaintiffs challenge as false and misleading statements made in PharMerica's Form 10–K for the year 1997, which was filed with the SEC on March 31, 1998. The statements challenged are the following (Doc. 81, p. 34) [18]:

> The Company believes that, when fully realized, the synergies from the merger would be approximately $25 million annually. This includes savings from the consolidation of 19 institutional pharmacies, seven of which have already occurred, more favorable pricing terms in the Company's new primary purchasing contracts and corporate and regional overhead reductions.

.    .    .    .    .

---

18. The plaintiffs also quote a statement that "PharMerica used 'more centralized financial and inventory controls systems than is typically available to small, independent pharmacy operators' and that many services, including oversight and financial and accounting functions, were performed at the corporate level" (id. at p. 34). The plaintiffs do not seem to contend that this statement is false or misleading since there are no allegations concerning it in the section stating the reasons why the Form 10–K is false or misleading (id. at pp. 34–35). In all events, the failure to provide any such reasons would defeat reliance upon the statement under the Reform Act. 15 U.S.C. 78u–4(b)(1).

The Company expects to realize approximately $16 million of these synergies in 1998 and the full $25 million ... beginning in 1999.[19]

The plaintiffs, referring to the alleged problems arising from the merger previously discussed, assert that "the merger was not synergistic" (*id.* at p. 34).[20] The plaintiffs' purported reasons are again off-target. The alleged problems do not demonstrate that the merger would not generate savings of $16 million in 1998 and $25 million in 1999. Furthermore, the plaintiffs do not even allege that the merger did not yield such savings. In other words, the plaintiffs have not alleged any facts showing that the quoted statements were false. This deficiency alone warrants rejection of the attack on the Form 10–K.

In addition, however, the statements are protected by the safe-harbor provisions. The statements are clearly forward-looking, and they have been identified in the Form 10–K as such (Doc. 46, Ex. A, p. 18). Moreover, the statements are plainly accompanied by meaningful cautionary language (*id.* at p. 18–19). Thus, the document states (*id.* at pp. 190–91):

> The effective integration of PCA and Capstone and the realization of the economic benefits of the Merger are particularly critical to the Company's success. Potential obstacles to successful integration include, but are not limited to: (i) retaining and integrating the Company's management team; (ii) consolidating pharmacies without losing any customer relationships; (iii) achieving operating efficiencies; (iv) consolidating departmental functions; (v) achieving anticipated purchasing efficiencies; (vi) consolidating management information systems; (vii) coordinating field managerial activities with corporate management; (viii) retaining and expanding the Company's customer base; (ix) introducing new products and services to existing facilities; and (x) adding and integrating key personnel. There can be no assurance that PCA and Capstone will be successfully integrated, or that the effects of the Merger will not have a material adverse effect upon the Company's results of operations, financial condition, or prospects.

These risk factors identify specific problems that could adversely affect the economic success of the merger. The cautionary language is therefore meaningful. Consequently, under the Reform Act's safe-harbor provisions, the quoted statements cannot support a claim of fraud. 15 U.S.C. 78u–5(c); *Harris v. Ivax Corp.*, supra, 182 F.3d at 803.

In addition, even in the absence of meaningful cautionary language, the statements would be protected by the safe-harbor requirement of actual knowledge. As indicated, the plaintiffs have not shown that the statements about the "synergistic" savings from the merger were false. Correspondingly, the plaintiffs have failed to allege any facts creating any degree of inference, strong or otherwise, that the defendants made the statements about synergies with actual knowledge that they

19. In an introductory phrase, the plaintiffs write that these quoted statements were made "[w]ith respect to its string of recent acquisitions" (*id.* at p. 34). This comment is inaccurate since the statements refer to "synergies from the merger," not the acquisitions.

20. It will be assumed that the investing public comprehended "synergies" to mean that the combined effects were greater than the individual effects. The large *Webster's Third New International Dictionary* (unabridged ed.1981), p. 2320, and the recently published *DK Illustrated Oxford Dictionary* (1998 ed.), p. 842, generally limit this definition to drugs, organs, and agents.

were false or misleading. Indeed, the fact that the defendants identified specific risk factors regarding the merger contradicts the assertion of a fraudulent state of mind.[21]

3. The plaintiffs have challenged two aspects of a press release issued by the defendants on May 4, 1998. First, the plaintiffs refer to financial results from the first quarter of 1998. Thus, the plaintiffs mentioned reported record revenues of $274 million for the quarter and net income per share of $.13, a 59% increase over the first quarter pro forma results of the prior year (Doc. 81, pp. 36–37). They also note that there was "reported 'net income of $11.3 million, an increase of 59 percent over 1997 first quarter pro forma earnings of $7.1 million'" (*id.* at p. 37).[22]

The plaintiffs, however, do not allege that these reported financial results were not accurate. Moreover, they do not allege any facts showing that the results were something other than what the defendants said. The plaintiffs therefore have failed to demonstrate that the statements concerning financial results were false.

The plaintiffs apparently contend that the financial results were misleading because the defendants failed to disclose (until eleven days later) that the company was experiencing a negative cash flow from its operating activities (Doc. 81, pp. 38–39). In the Form 10–Q for the quarter ending March 31, 1998, which was filed with the SEC on May 15, 1998, PharMerica stated (Doc. 83, Ex. D):

> The Company's net cash flows from operating activities were $(13.6) million and $(10.4) million respectively, for the three months ended March 31, 1998 and 1997. Generally, the cash flows from operating activities in each of the periods resulted from increased working capital requirements. Specifically, net cash from operating activities was most significantly impacted by a $35.6 million increase in accounts receivable. This increase resulted from approximately $19 million in increased revenues from the fourth quarter of 1997 and a $8 million increase in accounts receivable from Beverly Enterprises, Inc. pursuant to the terms of the Merger and an approximately $3 million increase in accounts receivable for entities acquired since December 1997.

█ The absence of this information from the May 4, 1998, press release does not render misleading the statements about revenues, net income per share, and net income.[23] The negative cash flow, which resulted significantly from an increase in accounts receivable, is a distinctly different matter from the information about revenues and income. Arguably, the information about a negative cash flow could have shed some light on the compa-

---

21. In their purported reasons why the Form 10–K was false or misleading, the plaintiffs contend that revenue forecasts had no legitimate basis (Doc. 81, p. 35). The plaintiffs, however, have failed to specify any statements about revenue forecasts as false or misleading. Accordingly, under the Reform Act, no such statements can support a claim for relief. 15 U.S.C. 78u–4(b)(1). Moreover, if what the plaintiffs had in mind were the revenue forecasts from acquisitions, those types of statements have previously been considered in detail and found not to provide a basis for a claim for relief.

22. With respect to this paragraph of the complaint, the plaintiffs also refer to a statement about eight acquisitions being expected to generate $67 million in annualized revenue (*id.*). That statement was noted previously and found not to support a claim for relief. *See, supra,* p. 1241 n. 16.

23. Since the May 4, 1998, press release was not among the attachments to the motion to dismiss and was not located among the documents scattered elsewhere throughout the file, it will be assumed that this information, or something like it, was not contained in that press release.

ny's financial situation, just as the reported financial results did. But so would a huge volume of other financial, operational and economic data, and, as previously explained, there is no general duty to disclose such information. Rather, under Rule 10b–5, the duty to disclose is limited to providing information that is necessary in order to make statements that were issued not misleading. The financial reports of revenues and income in the May 4, 1998, press release were not rendered misleading because the information about the separate subject of a negative cash flow was not included.[24]

Moreover, not only have the plaintiffs failed to establish that the statements about the first quarter financial results were false or misleading, but they have also failed to demonstrate that the statements were made with severe recklessness, which is the pertinent state of mind for those historical statements. Of course, the fact that the plaintiffs made no attempt to show that the reported financial results were false and the fact that they fell far short of showing that nondisclosure of a negative cash flow made those results misleading are inconsistent with a finding of scienter. Moreover, in their statement of reasons regarding the May 4, 1998, press release the plaintiffs do not allege any other circumstance raising an inference about the defendants' state of mind when that press release was issued (Doc. 81, pp. 38–39).

On the other hand, the defendants' disclosure of the negative cash flow just eleven days later in the Form 10–Q is contrary to the contention that the May 4, 1998, press release was issued with the requisite

scienter. There is no allegation suggesting that a fraudulent scheme would be advanced by withholding the disclosure of the negative cash flow for such a short period of time. Consequently, since the allegation of the nondisclosure of the negative cash flow was the only arguable basis for the challenge to the reported financial results, the disclosure of that information very soon after the May 4, 1998, press release refutes the idea that the defendants issued the press release with severe recklessness.

■ Despite the lack of any meaningful showing of scienter with respect to the press release, and the presence of evidence to the contrary, it is nonetheless appropriate to address at this point the plaintiffs' attempt to support an assertion of scienter by allegations of motive and opportunity to commit fraud. Significantly, the Eleventh Circuit has rejected the contention that allegations of motive and opportunity, standing alone, are sufficient to establish scienter. *Bryant v. Avado Brands, Inc.,* *supra,* 187 F.3d at 1285. Those factors, however, may be relevant to a showing of severe recklessness. *Id.*

In this case, the defendants unquestionably had an opportunity to commit fraud. That, however, is not unusual, since "corporate insiders and upper management always have opportunity to lie and manipulate." *Id.* at 1286 (*quoting Carley Capital Group v. Deloitte & Touche, L.L.P.,* 27 F.Supp.2d 1324, 1339 (N.D.Ga.1998)). Thus, this factor adds virtually no support to allegations of fraud.

The plaintiffs' allegations of motive, furthermore, do not advance a contention of

---

24. In the stated reasons why the May 4, 1998, press release was false or misleading, the plaintiffs also refer to the alleged operational problems with the merger. It would seem that that reference relates to the second aspect of the press release that is challenged. It

is implausible to contend that the information about the historical financial results was misleading because the merger problems were not disclosed. In all events, those problems did not have to be disclosed for the reasons explained earlier.

scienter. Indeed, the allegations are so flimsy that they undercut such a contention.

The plaintiffs allege that the defendants were fraudulently motivated to inflate PharMerica stock in order to (1) substantially increase the individual defendants' compensation through bonuses, (2) enable PharMerica to acquire Resident Pharmacy in North Carolina, since $9.1 million of the purchase price was paid for by stock, and (3) benefit PharMerica's private placement offering of $300 million in senior subordinated notes (Doc. 81, pp. 53–55). In their memorandum supporting the motion to dismiss, the defendants point out that the North Carolina acquisition was completed in 1997 before the start of the class period. In their response, the plaintiffs accordingly do not mention the North Carolina transaction as a motivating factor (Doc. 89, pp. 21–22). Thus, the plaintiffs have plainly abandoned the contention that the North Carolina transaction provides some evidence that the defendants had a motive to inflate fraudulently PharMerica's stock price.

The two remaining contentions are unpersuasive. With respect to the allegation that the defendants sought to increase their bonuses by inflating the stock price, this type of assertion has been rejected as insufficient. *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir.1995). Moreover, the defendants note that, as alleged in the complaint, bonuses were based on annual performance (Doc. 83, p. 19). Thus, an inference of scienter is even more attenuated here where the allegation is that the defendants fraudulently withheld information during the first half of 1998, apparently with the hope that the stock price would remain inflated for another six months or more until the bonuses were calculated. Furthermore, the defendants disclosed adverse information in November 1998, including the write-downs of certain assets. These disclosures render implausible the contention that the defendants had a scheme to withhold information so that they could receive bonuses at the end of 1998 based upon an inflated stock price.

The plaintiffs, as indicated, also contend that the defendants fraudulently inflated the stock price to benefit the company's private placement offering. An allegation like this has no force since it would seem to apply in just about every case. It would virtually always be true that a company would derive some economic benefit from a higher stock price. Consequently, an allegation of a motive similar to the one asserted here has been rejected as insufficient. *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 813–14 (2d Cir.1996).

On the other hand, as the defendants point out, the plaintiffs have not alleged that the individual defendants sold any stock during the class period. Such a circumstance plainly undermines the contention regarding motive. *Id.* at 814.

In short, the plaintiffs sought to support their allegation of scienter by demonstrating that the defendants had a motive to commit fraud. However, they have clearly failed in their attempt to make such a showing. If a motive to commit fraud can be a relevant circumstance supporting a claim of scienter, it would seem that an inability to show motive can be a relevant circumstance indicating the lack of scienter. In other words, there should be a negative inference regarding scienter as a result of the plaintiffs' unsuccessful attempt to demonstrate motive.

The plaintiffs, therefore, have not adequately alleged facts showing that the financial results reported in the May 4, 1998, press release can be the basis for a claim of fraud. Thus, the plaintiffs have

not shown that the statements were false or misleading. Further, they have failed sufficiently to allege that the statements were made with severe recklessness.

The second aspect of the May 4, 1998, press release that the plaintiffs challenge is the following (Doc. 81, p. 37):

> PharMerica's strong, top-line growth, combined with improvements in operating margins, has resulted in solid first quarter financial performance and progress in achieving our strategic objectives. Thanks to our extensive merger integration planning, we have achieved all of the first quarter milestones established last year.
>
> .     .     .     .     .
>
> With PharMerica's first quarter successes, we are well-positioned to move forward with efforts to establish PharMerica as the nation's premier provider of geriatric pharmacy services.

These statements are not actionable, first, because they consist of nothing more than vague, indefinite puffing. *See Parnes v. Gateway 2000, Inc., supra,* 122 F.3d at 547. Thus, for example, the assertion that the defendants "have achieved all of the first quarter milestones established last year" has no substantive content because there is no indication what those milestones were. Also, the reference to "PharMerica's first quarter successes" is devoid of meaningful substance in light of the lack of explanation of what those successes were: it could relate to the merger, it could relate to the financial results, it could relate to the acquisitions, or it could relate to some ill-defined combination of things that turned out well. As previously pointed out, it is not reasonable to think that the market would place any reliance on statements of this nature.

Furthermore, the plaintiffs have not set forth any facts showing that these statements are false or misleading. The plaintiffs in their statement of reasons assert that the statements are misleading because the defendants did not disclose the operational problems discussed earlier (Doc. 81, p. 38). As previously explained at length, *supra,* pp. 1242–45, the failure to disclose those types of problems, which involve at most corporate mismanagement, does not violate the federal securities laws. That is particularly true here where the operational problems that the plaintiffs have particularized with detail appear routine and unexceptional. Consequently, the failure to disclose those operational problems does not render misleading the statements in the May 4, 1998, press release concerning first-quarter successes and achievement of milestones. Notably, no other basis was asserted for finding those statements false or misleading.

In addition, even assuming the statements about first quarter successes and achievement of milestones were actionable and were false or misleading, the plaintiffs have not alleged facts that would raise a strong inference that they were made with severe recklessness. Thus, there are no facts alleged either in the pertinent statement of reasons (Doc. 81, pp. 38–39) or in the scienter section that directly speaks to the defendants' state of mind. Moreover, the assertions of motive to commit fraud, as previously explained, are unpersuasive.

There are, furthermore, circumstances that point against an inference of scienter. Specifically, prior to May 4, 1998, the defendants had made disclosures of unfavorable information concerning the merger. Thus, in the February 9, 1998, press release the defendants disclosed limitations with the company's information system and indicated, in particular, that even after ninety days thirty percent of the remote pharmacy locations would not be linked to the corporate financial system. Also in the company's Form 10–K filed on March

31, 1998, the defendants identified a number of factors that could affect the success of the merger (Doc. 46, Ex. A, pp. 190–91). These disclosures undercut the idea that the defendants were thinking about withholding information that would reflect badly upon the merger. Therefore, when all the circumstances are considered, they certainly do not raise a strong inference of severe recklessness with respect to the nondisclosure of the alleged operational problems.

In short, there are multiple reasons why neither aspect of the May 4, 1998, press release supports a claim of fraud.

4. The plaintiffs contend that there were false or misleading statements in a letter dated May 15, 1998, to shareholders from defendant Renschler that was filed with the SEC on May 18, 1998, with a Form 8–K.[25] The complaint alleges that the following statements in the letter were false or misleading (Doc. 81, pp. 39–40) (emphasis in complaint):

> Our first annual report outlines *our success in combining the resources of two outstanding institutional pharmacy groups, Capstone Pharmacy Services, Inc. and Pharmacy Corporation of America (PCA).*
> *This effective integration is a key to Pharmerica's [sic] leadership position* in the new competitive marketplace.
> *Because of the progress we have made since our merger,* we thought we would give you an update on these accomplishments and where we are headed.
> The recent first quarter also saw a great *emphasis placed on taking advantage of the benefits of integration.*
> Finally, we are happy to report that at our first senior management meeting in April, the energy and camaraderie exhibited by Pharmerica [sic] managers

proved that *Capstone and PCA have merged easily and quickly.*

Each of these five sentences constitutes, at most, vague, nonspecific puffing. Significantly, the plaintiffs in their memorandum do not develop a meaningful argument to the contrary. Indeed, to the extent that the quoted language is even referred to at all, it is mentioned only in passing (*see* Doc. 89, pp. 2, 5, 20). Consequently, the plaintiffs have not demonstrated that the language is actionable. An examination of the five sentences confirms that they are not.

The first sentence states that the company's report outlines the success in combining the resources of Capstone and PCA. The word "success" is vague and unexplained; there is no indication of any particular success other than the completion of the merger. Notably, the sentence states that the company's report outlines the success and thus, presumably, that report would contain more detail concerning what was successfully accomplished. Significantly, the plaintiffs do not point to any comment regarding success in that report that was false or misleading. Accordingly, there is no reason to think that the market attached any significance to the use of the word "success" in the sentence.

Similarly, the remark that "[t]his effective integration is a key to Pharmerica's [sic] leadership position" is too vague to be actionable. The word "effective" is not explained or qualified. It could mean "functioning"; it could mean "productive"; or it could mean "outstanding." *See The Oxford Dictionary and Thesaurus* (Am. ed.1996), p. 459. Moreover, the word "effective" is not illuminated by its context. In other words, the term is ambiguous.

---

**25.** Neither a copy of that letter nor the Form 8–K has been found among the four main piles of documents submitted by the defendants (*see* Docs. 46, 57, 83 and 90).

The market, therefore, would not attach any significance. to the second sentence in the May 15, 1998, letter that has been challenged.

In the third sentence, the plaintiffs emphasize the phrase concerning "progress we have made since our merger." This phrase also constitutes vague puffing. There is not any indication of the areas in which progress was made or the extent of that progress. Accordingly, the statement about progress would have been discounted by the investing public.

Similarly, the statement in the fourth sentence that "great emphasis [was] placed on taking advantage of the benefits of integration" has no substance and would be disregarded by the market. There is no specification of the benefits of integration. Moreover, there is no explanation of what advantage was gained from any benefits.

In the fifth sentence, the plaintiffs highlight the phrase that "Capstone and PCA have merged easily and quickly." Upon my initial review, this was the statement that seemed to me to be most likely to support a claim for relief. Interestingly, the parties did not appear to share my view about the significance of the statement. Thus, the plaintiffs only referred to it in passing (Doc. 89, pp. 2, 20), and the defendants did not mention it at all. The lack of attention that the parties gave to the phrase prompted. me to take a harder look at it.

Upon closer examination, it seems to me that the sentence is unclear and indefinite. Arguably, the sentence could be read to mean that all aspects of the merger have been completed and that no loose ends remained. This, however, is not a plausible reading in light of previous information that the defendants have disclosed. Thus, in the February 9, 1998, press release, the defendants acknowledged that, even after an additional ninety days (*i.e.*, May 10,

1998), the merger of the information systems would be limited to the extent that thirty percent of the remote pharmacy locations would not be linked to the corporate financial system (Doc. 57, Ex. E, p. 3). This disclosure contradicts a sentence that means a total integration of all phases of the two companies.

In addition, on March 31, 1998, the defendants specifically identified ten factors that were potential obstacles to successful integration (Doc. 46, Ex. A, pp. 190–91). It would be completely unrealistic to think that all ten of these obstacles had been eliminated in the succeeding forty-five days. Furthermore, the challenged sentence could not reasonably be construed to indicate that they were. The sentence states that the energy and camaraderie exhibited by managers at the first senior management meeting "proved that Capstone and PCA have merged easily and quickly." Obviously, the energy and camaraderie of the senior managers could not prove that all ten of the wide-ranging obstacles had been overcome. Rather, the sentence could mean at most that one of the potential obstacles—retaining and integrating the company's management team—had been resolved.

In short, when the phrase "Capstone and PCA have merged easily and quickly" is considered in the context of its sentence and of information that was previously disclosed, it is vague and unclear. Accordingly, like the other challenged sentences in the May 15, 1998, letter, it is not actionable because it would not have been given any significance by the market.

Furthermore, even assuming one or more of the sentences has some actionable substance, the plaintiffs' challenge to the letter fails because they did not allege any facts showing that the statements were false or misleading. In particular, the plaintiffs make no attempt to show that

the challenged statements were affirmatively false. For example, they do not allege that at the April 1998 meeting the senior managers did not exhibit energy or camaraderie, or that the company did not place a great emphasis on taking advantage of the benefits of integration.

The plaintiffs, rather, appear to contend that the statements are misleading because of the failure to disclose certain information. In this respect, the plaintiffs refer to the operational problems previously discussed, noting in particular the problems integrating the computer systems (Doc. 81, p. 40). As has been explained, *supra*, pp. 1242–45, these alleged problems, at most, amounted to corporate mismanagement and the failure to disclose them does not violate the federal securities laws. Furthermore, the defendants disclosed difficulties with the information systems by February 9, 1998, and they expected the limitations of the systems to continue past the time of the May 15, 1998, letter.

In an effort to show that the statements in the letter were misleading, the plaintiffs also allege that PharMerica was not achieving the benefits of integration and that extensive waste and duplication were created (Doc. 81, p. 40). The example given to support this allegation is so feeble that it deserves to be quoted because it is symbolic of the overall weakness of the plaintiffs' action. The complaint alleges (*id.* at pp. 40–41):

> [E]xtensive waste and duplication was [*sic*] created. This is exemplified through two PharMerica-owned pharmacies, one in Springfield, Colorado and another in the neighboring city of Broomfield, Colorado, each serving different accounts. Rather than consolidate the pharmacies, or strategically define each pharmacy's territory, the pharmacies' territories overlapped, and trucks from each of the pharmacies

passed each other on the highway daily, delivering products and servicing customers.

By May 15, 1998, PharMerica had approximately 160 pharmacy facilities in thirty-seven states (*see* Doc. 83, Ex. E, p. 19). It is, therefore, ludicrous to assert that the defendants were misleading the investing public and were doing so with severe recklessness because they did not disclose that two pharmacies in towns in Colorado had trucks with overlapping routes.

Furthermore, contrary to the plaintiffs' characterization, Springfield and Broomfield are not "neighboring" cities. My curiosity prompted me to consult a Colorado state map at Yahoo.com concerning the distance between those two towns. That inquiry revealed that the two towns are 262.7 miles apart, with Denver in between, and that the approximate travel time between the two is seven hours, eight minutes. Under these circumstances, it is certainly not apparent that the two pharmacies are clear candidates for consolidation, or that there is substantial overlap in the truck routes of the two pharmacies.

In the total picture of PharMerica's financial situation, the information about the Springfield and Broomfield, Colorado, pharmacies and their respective truck routes is plainly inconsequential. Since the investing public is not to be overwhelmed with such trivial matters, *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 448–49, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the defendants plainly did not violate Rule 10b–5 because they did not provide data regarding the two pharmacies. *See Parnes v. Gateway 2000, Inc., supra,* 122 F.3d at 547.

The plaintiffs also allege that the statements about the merger are misleading due to a failure to disclose that "larger acquisitions are accompanied by substantial risks and delays associated with con-

solidating larger acquisitions, as well as the costs of problems of assimilating larger companies into PharMerica's institution" (Doc. 81, p. 40). However, the challenged statements related to the merger, not acquisitions, and thus the failure to say, in effect, that larger acquisitions present larger problems would not make the statements about the merger misleading. Moreover, since it is obvious that larger acquisitions present larger problems, the failure to make such a statement would not violate federal securities laws. *Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Ins. Co.*, 606 F.2d 602, 611 (5th Cir.1979), *cert. denied*, 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (no claim for relief if the defendants failed to reveal the obvious or well known); *Hillson Partners Limited Partnership v. Adage, Inc.*, 42 F.3d 204, 213–14 (4th Cir.1994). Importantly, the defendants had previously disclosed on March 31, 1998, in the Form 10–K that "[t]he Company's successful implementation of its growth strategy depends on its ability to identify, consummate and integrate acquisitions" and that "[t]o the extent that the Company is unable to acquire institutional pharmacy companies, or to integrate such acquisitions successfully, its ability to expand its business would be reduced significantly" (Doc. 46, Ex. A, p. 191). For these reasons, there is no merit in the plaintiffs' contention that the statements about the merger in the May 15, 1998, letter were misleading because the defendants did not say, in effect, that larger acquisitions present larger problems.

In addition, the plaintiffs have not only failed to show that the statements in the letter about the merger were false or misleading, they have also failed to set forth any facts raising a strong inference that the statements were made with severe recklessness. The allegations of scienter with respect to these statements are no more substantial than, and not meaningful-

ly different from, those that have already been considered and rejected. Accordingly, for the reasons previously given, particularly those discussed with respect to the press release of May 4, 1998, *supra*, pp. 1251–52, the plaintiffs have not sufficiently alleged that the challenged statements in the May 15, 1998, letter were made with severe recklessness.

5. The final challenge to be considered is to the Form 10–Q for the period ending March 31, 1998, which was filed with the SEC on May 15, 1998. The complaint identifies as false or misleading the report of "pre-tax income of $20,431,000, net income of $11,330,000 and expenses of $85,528,000" (Doc. 81, p. 41). It also challenges again the following comments (*id*):

> The Company believes that, when fully realized, the synergies from the merger would be approximately $25 million annually.

> .    .    .    .    .

> The Company expects to realize approximately $16 million of these synergies in 1998 and the full $25 million ... beginning in 1999.

The complaint further alleges that the following statement is false or misleading (*id.* at pp. 41–42):

> The interim consolidated financial statements of the Company for the three months ended March 31, 1997 and 1998, included herein, have been prepared by the Company, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations. In the opinion of management, the accompanying unaudited interim consolidated financial statements reflect all adjust-

ments necessary to present fairly the financial position of the Company at March 31, 1998, and the results of its operations and cash flows for the three months ended March 31, 1997 and 1998.

The plaintiffs contend that these statements are false or misleading because of the operational problems that have previously been discussed in detail. For the same reasons, *supra*, pp. 1242–45, the operational problems do not support a fraud claim arising from the Form 10–Q.

Similarly, the repeat challenge to the statements about "synergies" from the merger can be quickly dispatched. These statements were considered in connection with the Form 10–K for 1997 and determined, for several reasons, not to support a claim of fraud. See *supra*, pp. 1247–48. Those same reasons apply here. They are not overcome by the plaintiffs' additional allegation that the defendants improperly delayed write-downs of impairment losses from five pharmacies. In the first place, the impairment losses have no apparent connection with the expected synergies from the merger, and the plaintiffs have not attempted to show in the complaint that they do. Furthermore, as will now be seen, the plaintiffs' allegations that the write-downs were improperly delayed are insufficient.

■ With regard to the challenge to statements in the Form 10–Q, the complaint alleged (Doc. 81, pp. 42–43):

The results reported in the First Quarter 10–Q were also false and misleading because the defendants knew, or recklessly disregarded, that the financial re-

sults were prepared in contravention of generally accepted accounting principles ("GAAP"). As the Company announced in a press release issued on November 9, 1998, announcing its financial results for the third quarter of its fiscal year 1998 (for the period ending September 30, 1998), the Company recorded an impairment loss of approximately $99.0 million which related primarily to five pharmacies, each of which had negative operating cash flows during 1998. In addition to recording write-downs to reflect the estimated net realizable value for these pharmacies, the Company closed one of the pharmacies during the third quarter of 1998 and identified three of the other pharmacies as "assets to be disposed of." Defendants also disclosed that it recorded a pre-tax loss on the sale of its DOC business, in the amount of $4.5 million— another loss which the Company had improperly deferred in contravention of GAAP.

The plaintiffs, in essence, allege that the financial results in the Form 10–Q were false and misleading because, in violation of GAAP, the defendants did not timely write down $99 million in impairment losses from five pharmacies, so that the company's assets and earnings were overstated during the first two quarters of 1998 (Doc. 89, pp. 15–16).[26] The contention is thus predicated upon showing that there was a GAAP violation.

The alleged violation, moreover, relates to the timing of the write-downs. In a press release on November 9, 1998, PharMerica announced a net loss of $127.4

---

26. Briefly in the complaint and at times in their memorandum, the plaintiffs refer to the $4.5 million pre-tax charge PharMerica took on its sale of the department of corrections business. Although this charge was also said to be taken in violation of GAAP, the plaintiffs made no meaningful attempt to show why this was so. Further, the primary focus in

their memorandum was the $99 million in write-downs, with only passing mention of the $4.5 million charge. Because the plaintiffs have failed to develop any argument based upon this latter charge, they will be deemed to have abandoned any contention based upon it.

million for the third quarter of 1998 and of $105.4 million for the first three quarters of 1998 (Doc. 90, Ex. F). The press release stated that the results of operations for these periods were affected by pre-tax charges of $99 million for write-downs of certain assets, a pre-tax charge of $37 million to increase the allowance for doubtful accounts, a pre-tax loss of $4.5 million from its sale in July 1998 of the department of corrections business, and $9.2 million of net restructuring charges (*id.* at pp. 1–2). The press release added (*id.* at p. 2):

The Company stated that the non-cash, pre-tax charges of approximately $99 million in the third quarter of 1998 were recorded to reflect write-downs of certain tangible and intangible assets in accordance with FASB Statement of Financial Accounting Standards No. 121 ("FAS 121"), Accounting for the Impairment of Long–Lived Assets and For Long–Lived Assets to Be Disposed of. FAS 121 requires companies to periodically review long-lived assets, including related goodwill, whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable based on the expected future cash flows.

The Company noted that substantially all of the FAS 121 write-downs relate to five pharmacies. Each of these pharmacies has had negative operating cash flows during 1998. The Company has closed one of these pharmacies during the third quarter of 1998 and has identified three of the other pharmacies as "assets to be disposed of" and has recorded write-downs to the estimated net realizable value of these pharmacies. The fifth pharmacy has had deteriorating operating results which required the Company to record the FAS 121 charge.[27]

The alleged GAAP violation is thus not that the defendants failed to write down assets under FAS 121, but that they did not do so soon enough. The plaintiffs have provided no factual allegations to support this contention. Rather, the plaintiffs rely upon virtually nothing more than the information the defendants disclosed in the November press release. That will not suffice to establish a GAAP violation.

The deficiencies in the plaintiffs' contention of a GAAP violation are patent. Importantly, the plaintiffs have failed to identify the five pharmacies that are primarily responsible for the $99 million write-downs. This is in all likelihood because the defendants did not do so, and the plaintiffs have no independent knowledge of the circumstances concerning the five pharmacies.

In fact, the plaintiffs do not even allege whether the pharmacies came to PharMerica through the merger, or were subsequently obtained through the acquisition strategy. The defendants' press release did not specify how the five pharmacies became part of PharMerica and, with one exception, the plaintiffs' allegations in the complaint reflect this lack of specificity. The complaint at one point does allege that the company reported the $99 million impairment loss "*that it expressly attributed to negative operating. cash flows of five of its acquired pharmacies 'during 1998'*" (emphasis in original) (Doc. 81, p. 39). If the plaintiffs mean by this that the defendants said that the five pharmacies were acquired as part of the growth by acquisition strategy, the plaintiffs are wrong; the defendants did not expressly state, or even

---

**27.** PharMerica's Form 10–Q for the third quarter of 1998, which was apparently filed on November 17, 1998 (Doc. 89, p. 7), contained similar language (Doc. 57, Ex. A, p. 20).

imply, how the five pharmacies became a part of PharMerica.

The plaintiffs carry this mistake through their memorandum, asserting that the five pharmacies were new acquisitions (*see, e.g.,* Doc. 89, pp. 3, 7). Whether they were or not does not seem to be established by the record. Maybe all were; maybe some were, or maybe none were. This uncertainty is indicative of the plaintiffs' failure to allege facts regarding the purported improper write-downs.

If, as the plaintiffs assert, the five pharmacies that were the subject of the write-downs, were newly acquired ones, that fact would underscore the plaintiffs' deficiencies in alleging a GAAP violation. Pharmacies were acquired at various times over the class period. Obviously, if the pharmacies at issue were not acquired before March 31, 1998, there would have been no circumstance calling for write-downs during the first quarter and thus the first quarter financial results stated in the Form 10–Q and the May 4, 1998, press release could not be misleading on that score. And even if some, or all, of the five pharmacies were acquired prior to March 31, 1998, they would have to have been in operation long enough so that negative operating cash flows would dictate that write-downs were warranted under FAS 121. The plaintiffs have not alleged any facts showing this to be the case.

The plaintiffs cannot, as they try to do, establish a GAAP violation merely by reliance upon the defendants' statements. All that the defendants have said about the $99 million write-downs is that they related substantially to five pharmacies; that they had negative operating cash flows during 1998; that during the third quarter one was closed and three were identified as assets to be disposed of; and that the fifth had "deteriorating operating results" (Doc. 90, Ex. F, p. 2; Doc. 57, Ex. A, p. 20). This limited information clearly does not demonstrate that, as the plaintiffs argue, "beginning in the first quarter of 1998, defendants improperly deferred impairment losses, in violation of GAAP" (Doc. 89, p. 7). Indeed, the idea that the five pharmacies should have been written down in the first quarter is totally baseless, especially if, as the plaintiffs assert, the five pharmacies were new acquisitions. Moreover, there is no fact alleged, and there is nothing in the defendants' statements, that shows that FAS 121 required a write-down of each of the five pharmacies during the second quarter of 1998.

The most that the plaintiffs seem to be able to muster on this point is a weak (and mistaken) comment regarding the pharmacy that was closed: "If the pharmacy was sold during the third quarter of 1998, one may reasonably infer that the defendants' decision to sell the pharmacy had been made well in advance and that such decision was based on consistent poor performance for some time" (Doc. 89, p. 17 n. 19). This argument is unpersuasive not only because the plaintiffs cannot keep their facts straight, but more substantially because (1) it would seem to take less time to close a store than to sell it, (2) there is no indication when the store was closed during the third quarter and it could have been in late September after about three months of operating losses during that quarter, and (3) in all events, there are no facts presented showing that the write-down should have occurred sooner than it did.

The complaint also alleged that "[o]n July 24, 1998, in a meeting with analysts, defendants admitted that the Company had been experiencing operational difficulties at a few of its pharmacies..." (Doc. 81, p. 51). The plaintiffs seem to think that this allegation supports a claim of a GAAP violation (Doc. 89, p. 16). However, this statement, which was allegedly made more than three weeks into the third quar-

ter, does not indicate the nature of the operational difficulties, does not state how long those difficulties had been occurring, does not identify the number of pharmacies involved, and does not even show that the pharmacies under discussion were the same pharmacies as to which write-downs were taken. Accordingly, this allegation is far too general to support the contention that there was a GAAP violation because the five pharmacies were not the subject of write-downs at some time prior to the third quarter.

The court in *K–tel International, Inc., Securities Litigation,* 107 F.Supp.2d 994 (D.Minn.2000), was presented with a very similar claim alleging a Rule 10b–5 violation because the defendant company did not take a write-off under FAS 121 sooner than it did. The court concluded that the plaintiffs failed to meet their obligation to plead "with particularity facts indicating that Defendants had an obligation either to perform a review for recoverability or to recognize an impairment loss under FAS 121." *Id.* at 1000. The court further rejected the plaintiffs' attempt to rely upon subsequent financial statements to show that the write-off was improperly deferred. *Id.* at 1000–01. *K–tel* thus confirms that the plaintiffs' allegations regarding a GAAP violation are plainly insufficient.

In sum, the plaintiffs have not established that the defendants violated FAS 121 when they did not write down the five pharmacies until the third quarter of 1998. It therefore follows that the financial results reported in the first quarter Form 10–Q and the press release of May 4, 1998, were not misleading because they did not reflect write-downs of the five pharmacies.[28]

The defendants also attack what they call the "Write–Off Theory" on the ground that there is a lack of loss causation (Doc. 83, p. 25). Although the write-down contention is defeated by the failure to show a GAAP violation, it is appropriate to address briefly the defendants' additional argument because of its surface appeal.

The defendants assert that loss causation is an essential element of the plaintiffs' claim and that the plaintiffs cannot establish that element "by asserting a claim on behalf of a class that ends in July 1998 based on a stock price drop related to a write-off in November 1998" (*id.* at p. 26). This contention would have force if the class "ended" in July 1998 in the sense that the class members both purchased and sold their stock before the end of the class period. However, the class is simply defined as those who purchased stock at inflated prices through July 24, 1998 (Doc. 81, p. 7; *but see* ¶ 129). Furthermore, the complaint does not purport to limit damages to those associated with the fall in the stock price on July 24, 1998. In other words, the pleading does not confine the damages to those which resulted from an inflated purchase price due to a failure to write down the five pharmacies and which were liquidated by a sale at some point prior to the write-downs in November 1998. Consequently, the defendants' loss-causation contention does not provide an alternative ground for rejecting the allegation of a GAAP violation.[29]

---

**28.** It is noted that the plaintiffs allege also that the defendants misrepresented in the Form 10–Q that the financial statements were prepared in accordance with GAAP (Doc. 81, p. 43). The defendants made no such representation; the defendants' reference to GAAP cited by the plaintiffs merely states that information and disclosures normally included in financial statements prepared in accordance with GAAP have been condensed or omitted pursuant to SEC rules and regulations (Doc. 73, Ex. A, p. 7). In any event, the plaintiffs have not shown that there was a GAAP violation.

**29.** Nevertheless, the defendants' contention reveals the problems and complexity that would be introduced if the allegation of a

The contention based on the alleged GAAP violation also fails on the scienter requirement. Notably, the plaintiffs seek to rely generally upon the alleged GAAP violation to support a showing of scienter with respect to the other challenged statements, not just the financial results reported in the first quarter Form 10–Q and the May 4, 1998, press release. However, since the plaintiffs failed to establish that there was a GAAP violation, the allegation of such a violation cannot be used to bolster a scienter argument for any statement or omission.

Furthermore, even assuming that the circumstances permit an inference of a GAAP violation, any such inference would be a weak one. With respect to scienter, the Reform Act requires much more. *See* 15 · U.S.C. 78u–4(b)(2). Consequently, "[t]he failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." *In re Comshare, Inc., Securities Litigation*, 183 F.3d 542, 553 (6th Cir. 1999). :

In addition, the other pertinent circumstances surrounding the write-downs, apart from the purported GAAP violation, do not raise an inference that the defendants were acting with severe recklessness in determining when to take write-downs under FAS 121, and may well point in the other direction. Thus, the circumstances urged by the plaintiffs are inconclusive at best. Moreover, the defendants' actions seem inconsistent with a fraudulent state of mind.

The plaintiffs contend that a claim of scienter is supported by the magnitude of the write-downs that were allegedly delayed improperly. Similarly, they rely

upon the fact that the pharmacies were central to PharMerica's business. These circumstances are plainly relevant since they would make it unlikely that the defendants, during an accounting review, merely overlooked the pharmacies and any financial problems. However, these circumstances, by themselves, fall far short of demonstrating scienter. *See K–tel International, Inc., Securities Litigation, supra,* 107 F.Supp.2d at 1004.

The plaintiffs argue further that the simplicity of the underlying accounting principles shows scienter (Doc. 89, p. 18). That argument is unpersuasive. FAS 121 does not set forth some bright-line test, but rather states guidelines that call for the exercise of accounting judgment (*see* Doc. 90, Exs. C, D). It appears that in some circumstances accountants might reasonably reach different conclusions about the application of FAS 121. The plaintiffs have totally failed to explain in this case why the alleged violation of FAS 121 was, as they contend, so simple and clear (*see* Doc. 89, p. 18).

There are, on the other hand, circumstances which seem to cut against the claim of scienter regarding the alleged GAAP violation. Thus, in the first quarter Form 10–Q, the defendants disclosed that they were intending to close six former PCA pharmacies and fourteen former Capstone pharmacies and that the company had negative cash flows from operating activities during the first quarter (Doc. 73, Ex. A, pp. 10, 15). This negative information is of the same type as the information that was involved in the write-downs, although the write-downs appear to have had a much greater impact. Nevertheless,

GAAP violation were meritorious, especially if it were the only allegation that survived scrutiny. In that event, the class period could not plausibly begin on January 7, 1998, and seemingly could not commence before the alleged misleading statements were made in May

1998. Further, the class could only include people who did not sell their stock prior to November 9, 1998, since anyone who did sell before that would appear to have benefited from the inflated price.

if, as the plaintiffs contend, the defendants were acting with scienter in May 1998, they seemingly would have withheld the negative information about the twenty pharmacy closures and the negative cash flows. In other words, their disclosure of that information is inconsistent with the contention that in May 1998 the defendants were acting with scienter.

Furthermore, there is no apparent reason why, if the defendants were intending to defraud, they took the write-downs in November 1998. The plaintiffs have provided no cogent explanation how the defendants gained from delaying the write-downs from the first or second quarter to the third quarter. Thus, there is no allegation that during this period the individual defendants sold stock, or that the company received a specific economic benefit. Moreover, the write-downs in November 1998 seemingly impaired the individual defendants' bonuses since they were apparently calculated on an annual basis. If, as alleged, the defendants had been driven by an intent to defraud, they would have delayed the write-downs until after the beginning of 1999.

The surrounding circumstances, therefore, do not raise an inference, and certainly not the required strong one, that when write-downs of the five pharmacies were not taken in the first or second quarter, the defendants either knew that the failure to take the write-downs was a GAAP violation, or must have been aware of the violation because it was so obvious. Of course, the primary circumstance defeating the claim of scienter is the plaintiffs' failure to demonstrate that there was a GAAP violation.

For these reasons, the plaintiffs' allegation that the first quarter Form 10–Q contains false and misleading statements is insufficient to state a claim for relief.

█ D. In an effort to buttress their claims, the plaintiffs refer in the complaint,

and in their memorandum, to statements made by securities analysts. Significantly, none of these comments has been identified as a false or misleading statement. Accordingly, under the Reform Act, the statements may not provide a predicate for a claim.

Moreover, the defendants argued in their memorandum that the plaintiffs have not alleged facts that would make those statements chargeable to the defendants (Doc. 83, p. 4 n. 7). *See Suna v. Bailey Corp.*, 107 F.3d 64, 72–74 (1st Cir.1997); *In re Syntex Corp. Securities Litigation*, 95 F.3d 922, 934 (9th Cir.1996). And in their reply, the defendants correctly point out that the plaintiffs did not even attempt to argue that the complaint alleges the requisite facts to make the defendants liable for statements of outside securities analysts (Doc. 91, p. 2).

The comments by securities analysts were therefore simply considered as context or background information. Especially when viewed in this manner, the comments do not warrant a change in the conclusion, reached after a close examination of each challenged statement, that none of the statements supports a claim for relief.

E. The first claim of the complaint alleges violations of § 10(b) of the Exchange Act and Rule 10b–5 (Doc. 81, p. 62). The violations are based upon a number of alleged false statements and misleading omissions. An examination of each of the statements and omissions demonstrates that not one of them supports a claim under § 10 and Rule 10b–5. Indeed, each of the challenged statements and omissions fail for more than one reason. Accordingly, the first claim of the complaint should be dismissed.

█ With the dismissal of the first claim, the second claim also falls. The second claim alleges a violation of § 20(a)

of the Exchange Act against the individual defendants. Section 20(a) imposes joint and several liability upon a party that is a "controlling person" of a party that is liable. *See* 15 U.S.C. 78t(a). In this case, therefore, the § 20(a) claim is dependent upon the allegation of an actionable claim under § 10(b). *K–tel International, Inc., Securities Litigation, supra,* 107 F.Supp.2d at 1005; *see also Theoharous v. Fong, supra,* 256 F.3d at 1227. Since the first claim, which is predicated upon § 10(b) and Rule 10b–5 violations, is not actionable, neither is the second claim, which is based upon § 20(a). Consequently, both claims of the complaint should be dismissed.[30]

F. The defendants argue that the dismissal of the complaint should be with prejudice. Under the circumstances, such a dismissal is warranted.

■■■ The second amended complaint is the first version that has been subjected to a close and detailed examination. That circumstance would typically favor the opportunity to file an amended complaint. *Bryant v. Dupree,* 252 F.3d 1161 (11th Cir.2001).

In this case, however, the plaintiffs have already been fairly warned that, under the Reform Act, they were required to file a detailed complaint setting forth all of their pertinent allegations. Thus, after a hearing on the defendants' motion to dismiss the first amended complaint, an order was entered directing the plaintiffs to file a list of each statement or omission that was alleged to be false, and a corresponding statement of the allegations showing why the statement or omission was false (Doc. 72). In response, the plaintiffs submitted a document that set forth a number of allegations that were not included in the amended complaint. Accordingly, a Report and Recommendation was prepared which recommended that the motion to dismiss be granted on the ground that the Reform Act had been violated due to the plaintiffs' failure to set forth each statement that was misleading (Doc. 80). The dismissal was recommended to be without prejudice because "the plaintiffs have not yet been given the opportunity to amend the complaint to cure deficiencies" (*id.* at p. 11). The plaintiffs responded with their seventy page second amended complaint even before the recommendation for a dismissal without prejudice was adopted (*see* Docs. 81, 82).

These circumstances show that, after the first hearing, the plaintiffs recognized that their first amended complaint was inadequate and that they sought to bolster it by submitting additional allegations. Moreover, the specific pleading requirements of the Reform Act were expressly called to the plaintiffs' attention (Doc. 80), thereby giving fair warning that the plaintiffs should set forth all allegations that would support the claims.

The plaintiffs, thereafter, appeared to heed that warning. Thus, they filed a lengthy second amended complaint, which added about seventeen pages of allegations. Further, they seem to have employed a shotgun style of pleading. From all that appears, the plaintiffs alleged everything they could think of that might

---

**30.** The defendants recently submitted, as supplemental authority, the case of *In re Navarre Corporation Securities Litigation,* 295 F.3d 791 (8th Cir.2002), which was decided on July 1, 2002. The mandate in that case was subsequently recalled and a revised opinion was issued on July 31, 2002. *See* 299 F.3d 735 (8th Cir.2002). Even as revised, the opinion provides additional support for the defendants on such matters as statements by securities analysts (*id.* at 742–43), GAAP violations (*id.* at 744–45), and motive (*id.* at 745–46). However, due to the unsettled status involving the recall of the mandate, I have not directly relied upon that decision.

sustain their claims. The plaintiffs therefore were afforded, and took, the opportunity to attempt to cure deficiencies in prior pleadings.

It is recognized that the plaintiffs fouled-up one of their allegations by quoting language from the wrong press release (*see supra*, pp. 48–49). That sloppiness hardly seems to justify the opportunity to file another amended complaint. In any event, there is every reason to think that the correction of that mistake would be futile; all of the challenges based upon the press releases were meritless, and there is nothing in the press release of April 15, 1998, that would warrant a different conclusion (Doc. 83, Ex. E, pp. 18–20).

Similarly, any other amendment to the complaint seems futile. *See Bryant v. Dupree, supra*, 252 F.3d at 1163. I have closely examined not only the lengthy complaint, but also the substantial materials submitted in connection with it. There is nothing about the facts that suggests fraud to me. Rather, this case appears to me to involve nothing more than shareholders who were disappointed when the PharMerica stock price dropped on July 24, 1998, allegedly because the company announced earnings per share of twelve cents and not the fourteen cents the market had been led to expect. In light of the plaintiffs' failure to generate any meaningful manifestation of fraud, a further amendment of the complaint would be futile.

Significantly, the defendants contended in their memorandum that the dismissal should be with prejudice and the plaintiffs did not respond with any argument in opposition to such a dismissal. This seems to confirm that the plaintiffs have nothing to add.

## IV.

For the foregoing reasons, I recommend that the defendants' motion to dismiss (Doc. 83) be granted, and that the second amended complaint be dismissed. I recommend further that the dismissal be with prejudice.

August 4, 2002.

### *NOTICE TO PARTIES*

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal. 28 U.S.C. 636(b)(1).